STATE of Wisconsin, Plaintiff-Respondent,

v.

Nicole SCHUTTE, Defendant-Appellant.†

Court of Appeals

*No. 2005AP658–CR. Submitted on briefs January 19, 2006.
—Decided June 22, 2006.*

**2006 WI App 135**

(Also reported in 720 N.W.2d 469.)

† Petition to review denied 10/10/06.

258

259

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Donald T. Lang*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Christopher G. Wren*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Vergeront, Deininger and Higginbotham, JJ.

¶ 1. DEININGER, J. Nicole Schutte appeals a judgment convicting her of three counts of homicide by negligent operation of a vehicle. She also appeals an order denying her motion for postconviction relief. Schutte's five claims and our disposition of them are as follows:

¶ 2. (1) Schutte contends the State presented insufficient evidence to prove her guilty of criminal negligence. We conclude the State presented sufficient evidence for the jury to find her guilty of homicide by negligent use of a vehicle. The record contains evidence of the circumstances under which Schutte was driving at the time her car crossed the highway centerline. Jurors could reasonably conclude from that evidence that Schutte's conduct was criminally negligent.

¶ 3. (2) Schutte asserts that the trial court's reading of an excerpt from an appellate decision to jurors during closing arguments "invaded the fact-finding province of the jury" by communicating the "judicial endorsement" of a guilty finding. We conclude the trial court did not err when, after defense counsel during closing argument misstated the law regarding the proof necessary for a finding of guilt on the charged offenses, the court quoted from appellate precedent in order to clarify for jurors the State's burden of proof and the unanimity requirement.

¶ 4. (3) Schutte claims the trial court erred in admitting evidence that she had smoked marijuana on the day of the fatal collision. We conclude the trial court did not erroneously exercise its discretion in admitting evidence of Schutte's marijuana use prior to the collision. The evidence was relevant to the jury's determination of whether Schutte was criminally negligent at

the time of the collision, and its probative value was not substantially outweighed by the danger of unfair prejudice.

¶ 5. (4) Schutte asks us to grant her a new trial in the interest of justice because the jury was not given a "conditional relevance" instruction regarding its consideration of the marijuana evidence. We conclude that the lack of a special instruction to limit or condition the jury's consideration of the marijuana evidence did not prevent the real controversy from being fully tried.

¶ 6. (5) Finally, Schutte maintains that the prosecutor's improper closing argument deprived her of due process and a fair trial. We first conclude that, because Schutte did not move for a mistrial grounded on the prosecutor's allegedly prejudicial comments during closing argument, she waived any claims of error stemming from the prosecutor's remarks. We also decline to exercise our authority to grant a new trial in the interest of justice because we cannot conclude the argument in question constituted plain error rendering the trial so unfair that Schutte was denied due process.

¶ 7. Because we reject Schutte's claims of error and her requests for discretionary reversal, we affirm the appealed judgment and order.

## BACKGROUND

¶ 8. Nicole Schutte, an eighteen-year-old high school senior, was driving her car from Ashland to Mellen on a snowy February night. She had three passengers with her, her boyfriend and two other friends. The weather that day had been snowy and windy, and the rural, two-lane highway was icy and slippery in places. On a curve in the highway, Schutte's car crossed the highway centerline and collided with a

pick-up truck traveling in the opposite direction. All three of her passengers were killed in the collision. The State charged Schutte under WIS. STAT. § 940.10(1) (2003–04)[1] with three counts of homicide by negligent operation of a vehicle.

¶ 9. Schutte gave several different accounts of what she was doing just before the fatal collision. In some accounts, as related by witnesses at trial, she said she was changing a compact disc (CD); in others, she said she had leaned down to pick up a French fry. In several accounts, Schutte acknowledged taking her eyes off the road momentarily, saying that when she looked back up, her car was sliding into the oncoming traffic lane of the rural highway. Schutte told a firefighter and a sheriff's deputy who arrived at the scene that she had smoked marijuana earlier that day. Another witness testified that, about a week after the crash, Schutte told her that, just before the collision, "she was going 70 [miles per hour] and she passed the bowl [of marijuana] behind her," but that later Schutte said that the item passed was a CD.

¶ 10. Schutte also gave accounts of the events preceding the collision to a police officer and the coroner, who had both responded to the crash scene. She told them that she had come home from school in mid-afternoon and taken "four teaspoons" of cough syrup containing codeine, which she said was "twice as much as she was suppose to take." Schutte then napped, awoke around 4:30 p.m. and drove to pick up her three friends to go to a party. Schutte told both witnesses that she smoked marijuana during this time, one witness testifying that Schutte said the marijuana use had

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

occurred at the home of one of the passengers, the other saying that Schutte said she took a "few hits" while driving after picking up her friends. Both of these witnesses also related Schutte's statements that, just prior to the collision, she was either "choking on a French fry" or reaching to change a CD. Schutte told the coroner that "she felt the car veer to the right and she thought she should correct herself so she turned the wheel to the left and she thought that she over-corrected herself to run into the oncoming traffic."

¶ 11. The defense presented a number of witnesses who testified to the snowy, slippery road conditions on the night of the collision, describing the conditions in the vicinity of the crash as "like ice," "slushy" and "a white-knuckle ride." An accident reconstruction expert called by the defense opined that both vehicles involved in the collision were traveling less than fifty miles per hour at the time of impact. He determined that Schutte's vehicle crossed the center line of the road, sliding sideways, and the right rear of her car collided with the right front of the oncoming pickup. The expert opined that the collision occurred after Schutte "lost control of her vehicle . . . due to the slippery conditions," but acknowledged on cross-examination that "obviously the way she was driving contributed to it."[2]

¶ 12. The jury found Schutte guilty of the three counts as charged. The court, after imposing and staying concurrent ten-year sentences on each count, consisting of five years' initial confinement and five years'

---

[2] The accident reconstruction expert replied in the affirmative to the prosecutor's questions whether "driving too fast for conditions," "inattentively driving," or "if someone wasn't watching the roadway while going into a corner" could have been factors in the crash.

extended supervision, placed Schutte on probation for five years with a condition that she spend one year in the county jail. She moved for postconviction relief, requesting that the charges be dismissed because the evidence at trial was insufficient to convict her, or, alternatively, for a new trial because of the allegedly erroneous admission of the marijuana evidence, the court's improper instruction to jurors during the defense closing argument, and the prosecutor's allegedly prejudicial statements during his closing argument. The court denied Schutte's postconviction motion and she appeals.

## ANALYSIS

### *Sufficiency of the Evidence*

¶ 13. We first address Schutte's claim that the State produced insufficient evidence at trial to convict her of homicide by negligent operation of a vehicle under WIS. STAT. § 940.10(1). If she were to prevail on this claim, we would be required to vacate her conviction and the State would not be entitled to re-try her. *See State v. Perkins*, 2001 WI 46, ¶ 47& n.26, 243 Wis. 2d 141, 626 N.W.2d 762 (citing *Burks v. United States*, 437 U.S. 1 (1978)). If we conclude the State produced sufficient evidence to sustain the jury verdicts, we must then consider whether any of the errors Schutte asserts entitles her to a new trial. *See id.*

¶ 14. We will not reverse a conviction for insufficient evidence " 'unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have

found guilt beyond a reasonable doubt.' " *See State v. Johannes*, 229 Wis. 2d 215, 221, 598 N.W.2d 299 (Ct. App. 1999) (quoting *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990)). " 'The test is not whether this court or any of the members . . . are convinced [of the defendant's guilt] beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true.' " *See Poellinger*, 153 Wis. 2d at 503–04 (citation omitted).

¶ 15. A challenge to the sufficiency of the evidence presents two questions. We must first determine what the State was required to prove, and then, applying the standard of review noted above, whether it did so. The present dispute centers largely on the first question, and to a lesser degree, the second. Put another way, the challenge to the sufficiency of the evidence in this case, as in many cases, is less a dispute over the weight and probative value of the evidence the State presented at trial, and more a disagreement regarding what the statutes and case law require the State to prove in order to obtain a conviction.

¶ 16. Schutte contends that our decision in *Johannes* has "produced some confusion" because, in her view, certain language in the opinion suggests "that a finding of criminal negligence is warranted whenever a fatal crash results from the defendant's vehicle crossing the centerline." She asks us to "clarify the line between those circumstances where a fatal vehicle accident, though unquestionably tragic, is a matter to be addressed in the civil courts applying traditional negligence principles, and those situations where a motorist's conduct is sufficiently egregious to be punished as criminal negligence."

¶ 17. It is always this court's goal to foster clarity in the law, and we will attempt to do so here. We note, however, that Wisconsin judges and legislators have long grappled with the difficult question of when a person whose negligent conduct results in unintended harm should be subjected to criminal prosecution and penalties. *See Hart v. State*, 75 Wis. 2d 371, 379–84, 249 N.W.2d 810 (1977) (describing statutes and judicial decisions dating from 1922 dealing with "the problem of fashioning a suitable criminal statute to deal with death caused by conduct which, notwithstanding its accidental nature, the legislature believes to be sufficiently blameworthy to merit punishment as a public offense"); *State v. Barman*, 183 Wis. 2d 180, 198–200, 515 N.W.2d 493 (Ct. App. 1994) (recounting "history of changes and challenges to Wisconsin's homicide by negligent operation of a vehicle statute" since 1941).

¶ 18. Our analysis begins with the language of the statute creating the crime at issue, the interpretation of which presents a question of law we decide de novo. *See Truttschel v. Martin*, 208 Wis. 2d 361, 364–65, 560 N.W.2d 315 (Ct. App. 1997). We must give the statutory language its common, ordinary and accepted meaning, except that technical or specially defined words are assigned their technical or special definitions. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. It is also true "that a judicial construction of a statute becomes part of the statute unless subsequently amended by the legislature." *See Wenke v. Gehl Co.*, 2004 WI 103, ¶ 31 n.17, 274 Wis. 2d 220, 682 N.W.2d 405. Because Wisconsin appellate courts have interpreted and applied the language that is at issue in this appeal on numerous occasions over the past fifty years, often on facts similar

to those before us now, we must also consider what these precedents teach about the proof required for conviction of homicide by negligent operation of a vehicle under WIS. STAT. § 940.10.

■

¶ 19. WISCONSIN STAT. § 940.10(1) provides that a person who "causes the death of another human being by the negligent operation or handling of a vehicle is guilty of a Class G felony." The term "negligent" as used in § 940.10 requires proof of "criminal negligence." *See* WIS. STAT. § 939.25(2). In order to prove a violation of § 940.10, the State must establish beyond a reasonable doubt that (1) the defendant operated a vehicle; (2) the defendant operated the vehicle in a criminally negligent manner; and (3) the defendant's criminal negligence caused a person's death. *See Johannes*, 229 Wis. 2d at 221 n.2; WIS JI—CRIMINAL 1170. The meaning of the term "criminal negligence" is thus central to our disposition of Schutte's claim that the State produced insufficient evidence to sustain her conviction under § 940.10. The legislature defines "criminal negligence" as "ordinary negligence to a high degree, consisting of conduct that the actor should realize creates a substantial and unreasonable risk of death or great bodily harm to another." Section 939.25(1).

¶ 20. We noted in *Barman*, 183 Wis. 2d 180, that the definition in WIS. STAT. § 939.25(1), enacted in 1988, effected a slight change in language from the statutory definition of a "high degree of negligence" that previously applied to prosecutions for homicide by negligent use of a vehicle. *Id.* at 199–200. We also cited a Wisconsin Law Review article discussing the 1988 revision for the proposition that the new language did not "work a substantive change" from the former WIS. STAT. § 940.08 (enacted in 1955) regarding the showing required to

271

render negligent conduct criminally culpable. *Id.* at 200; *see also State v. Wickstrom,* 14 Wis. 2d 416, 421–22, 111 N.W.2d 176 (1961) (discussing statutory definition of "high degree of negligence" in the former § 940.08; concluding the "concept is the same as expressed in" *State ex rel. Zent v. Yanny,* 244 Wis. 342, 12 N.W.2d 45 (1943)). Thus, we conclude that judicial interpretations of the statutorily required "high degree of negligence" under the former § 940.08 are relevant to our analysis of what is required to prove "criminal negligence" under the present Wis. Stat. §§ 939.25 and 940.10.

¶ 21. The supreme court explained in *Hart,* 75 Wis. 2d 371, that the "high degree of negligence" required for criminal culpability "is distinguished not by any different mental state on the part of the actor [as compared to ordinary negligence creating civil liability in tort], but by the existence of a high probability of death or great bodily harm as measured by the objective reasonable person test." *Id.* at 383. The court also noted in *Hart* that the degree of negligence required for criminal culpability is different from ordinary negligence in that the negligent conduct must "in general create a risk of serious consequences, e.g., death or great bodily harm," and there must be a "high probability that the [serious] consequences will result from" the conduct. *Id.* at 383–84 n.4. The probability in question need not, mathematically, "be greater than 50 per cent," but the chance of the conduct causing death or great bodily harm "must be greater than would be required to sustain a verdict for damages in tort" and "would be considered great by the ordinary person, *having in mind all the circumstances of the case,* including the seriousness of the probable consequences." *Id.* (emphasis added).

¶ 22. Schutte maintains that this was a "truly [] tragic" accident that should perhaps render her civilly liable to her victims or their survivors, but which did not involve the "particularly egregious circumstances" for which prosecutions under Wis. Stat. § 940.10 are reserved. She attributes the fact that she crossed the highway centerline to the hazardous winter weather conditions, and asserts that, even if she was momentarily distracted by picking up a French fry or changing a CD, her behavior did not fall outside the range of behavior of a "normally prudent driver [who] would not reasonably foresee that eating in the car or playing a CD poses a substantial risk of a serious accident." Schutte contends this is so because "our culture assumes that motorists will engage in other tasks while driving." She also discounts the evidence regarding the THC[3] detected in her blood because the expert who testified regarding it could neither correlate the level detected with any specific level of impairment, nor could the expert say whether the THC affected Schutte's ability to drive safely.

¶ 23. In response, the State relies on *Wickstrom*, where the supreme court said that "[i]t was not necessary for the state to prove why the defendant crossed the highway or committed the act." *Wickstrom*, 14 Wis. 2d at 423. It also points to our decision in *Johannes*, where we said that "the State meets its burden after submitting evidence of criminally negligent conduct—in this case, evidence that Johannes crossed the highway's centerline." *Johannes*, 229 Wis. 2d at 227. By citing the quoted language, the State seemingly suggests that, to prove Schutte guilty of homicide by

---

[3] "THC" is the abbreviated term for tetrahydrocannabinols, an ingredient of marijuana. *See* ¶ 42.

negligent operation of her vehicle, it needed to establish only that Schutte's vehicle crossed the center line (which Schutte acknowledges she cannot "seriously dispute[]"), that a collision ensued and three deaths resulted. In Schutte's view, the law requires (or, at least, should require) more to establish criminal negligence than simply proof that her vehicle crossed the highway centerline before the collision.

■

¶ 24. Had the State's only evidence of Schutte's pre-collision conduct been that, on a snowy evening with icy road conditions, her vehicle crossed the highway centerline and collided with an oncoming vehicle, we might agree that Schutte's convictions under Wis. Stat. § 940.10 could not be sustained. That is so because the violation of a traffic statute, standing alone, does not necessarily prove that a defendant engaged in criminally negligent conduct. The trial court properly instructed jurors that the violation of a traffic statute, such as Wis. Stat. § 346.05(1) (requiring motorists to "drive on the right half of the roadway"), "does not necessarily constitute criminal negligence. You may consider this along with all the other evidence in determining whether the defendant's conduct constituted criminal negligence." *See* Wis JI—Criminal 1170.[4]

■

¶ 25. The quoted instruction and the precedents on which the State relies make clear that a traffic

[4] The Criminal Jury Instructions Committee explains that this portion of its recommended instruction on the elements of Wis. Stat. § 940.10 is based on the supreme court's analysis in *State v. Dyess*, 124 Wis. 2d 525, 370 N.W.2d 222 (1985). The court concluded in *Dyess* that it was error to tell jurors that "[a]ny speed in excess of that limit would be negligent speed regardless of other conditions." *Id.* at 531.

274

violation cannot be viewed in isolation but must be considered within the context of the circumstances under which the defendant was driving. The supreme court emphasized the importance of a traffic violation's circumstantial context in its sufficiency-of-the-evidence discussion in *Wickstrom*: "*Taking into consideration the circumstances under which the defendant was driving his car,* the jury was entitled to find the defendant should have realized that crossing into the lane of an oncoming car 60 feet away, traveling 50 miles an hour, created a situation of unreasonable risk and high probability of death or great bodily harm to another . . . ." *Wickstrom*, 14 Wis. 2d at 422 (emphasis added).

¶ 26. We relied heavily on the *Wickstrom* analysis when addressing the defendant's insufficiency of the evidence claim in *Johannes*, noting that the facts in the two cases were "remarkably similar." *Johannes*, 229 Wis. 2d at 225. We concluded in *Johannes* that evidence the defendant's vehicle had crossed the highway centerline was sufficient to permit jurors to conclude, under the applicable objective standard, that the defendant's "conduct created a substantial and unreasonable risk of death, great bodily harm and bodily harm." *Id*. at 227. We recognized in our analysis, however, that the defendant's crossing of the centerline could not be divorced from the circumstances under which the act had occurred. In arriving at our conclusion on the sufficiency of the evidence in *Johannes*, we quoted at length from *Wickstrom*, specifically including the emphasized language noted in the preceding paragraph. *See id*. at 226 (quoting *Wickstrom*, 14 Wis. 2d at 422–23).

¶ 27. Thus, our conclusion in *Johannes* that "the State meets its burden after submitting evidence of criminally negligent conduct—in this case, evidence

that Johannes crossed the highway's centerline," *id*. at 227, must be viewed as including the qualifier, considering "the circumstances under which the defendant was driving his car," *Wickstrom*, 14 Wis. 2d at 422. Those circumstances in *Johannes* included that it was a "dry and cloudy afternoon," Johannes had been observed "slumped over in the driver's seat" immediately prior to the collision, he had failed to take evasive action or brake prior to crossing the centerline, and he had made statements that he was adjusting his stereo or had probably fallen asleep at the wheel immediately prior to the collision. *Johannes*, 229 Wis. 2d at 219–20.

¶ 28. Moreover, we explained in *Johannes* that, after the State meets its burden by submitting evidence of criminally negligent conduct, "a defendant remains free to present evidence to the jury that he or she hopes may explain such conduct," which "may serve to mitigate the defendant's conduct down from the high degree of negligence required for criminal negligence." *Id*. at 227. The supreme court made a similar point in *Wickstrom*, noting that the "defendant did not prove an excusable reason" for crossing the highway centerline into the path of an oncoming vehicle, such as "being confronted with an emergency and making the wrong judgment." *Wickstrom*, 14 Wis. 2d at 423.

■

¶ 29. The decisions in both of these cases thus make clear that, in order to convict someone of violating § 940.10, the State must satisfy jurors beyond a reasonable doubt that the defendant engaged in conduct, which, under all of the circumstances present, the defendant should have realized created a substantial and unreasonable risk of death or great bodily harm to another person. *See* Wis. Stat. § 939.25(1). A defendant may avoid criminal liability if jurors determine that the

State failed to establish beyond a reasonable doubt that the defendant's conduct while operating a vehicle rose to that level of culpability because, under the circumstances under which the defendant was driving, either the risk of life-threatening consequences was not a substantial one, or if it was, the circumstances, such as the presence of an emergency, rendered the risk not unreasonable.

¶ 30. We therefore reject Schutte's argument that our discussion in *Johannes* renders Wis. Stat. § 940.10 a "strict liability" offense "that authorizes a ten[-]year felony punishment for any driver who loses control of a vehicle resulting in a fatal accident," or that sustaining her convictions in this case would produce that result. Schutte asserts that a "mechanistic view that any crossing of the center line constitutes criminal negligence would irrationally extend felony liability to accidents resulting from unexpected health emergencies (a heart attack or stroke) or mechanical problems (a blown tire)." We do not, however, view the State as embracing such a "mechanistic view" in this case, nor do we.

¶ 31. As we have noted, the State's reliance on certain language in *Wickstrom* and *Johannes* might suggest an argument that the State could properly rest its prosecution on proof of nothing beyond the fact that Schutte's vehicle crossed the highway centerline. The State, however, does not attempt to sustain Schutte's convictions on the basis of that undisputed fact. Rather, the State summarizes the evidence it claims to have presented showing that Schutte engaged in "conduct that the actor should realize creates a substantial and unreasonable risk of death or great bodily harm to

277

another," *see* WIS. STAT. § 939.25(1), as follows: "Schutte drove too fast for conditions on an obviously treacherous road during obviously dangerous weather conditions, took her eyes off the road, drove with one hand while eating or reaching for an object or passing an object around, and crossed the centerline of the road at a high rate of speed."[5] By summarizing the evidence in this fashion, the State, consistent with the analyses in *Wickstrom* and *Johannes*, acknowledges that to convict Schutte of violating WIS. STAT. § 940.10, it needed to establish something more than the mere fact of Schutte's car crossing the highway centerline. As we have explained, that something more is the circumstances under which Schutte was driving her car, and we agree with the State that the evidence it produced regarding those circumstances is sufficient to sustain the jury's guilty verdicts.

¶ 32. Schutte's own statements to emergency personnel and others at the scene of the collision support the jury's verdicts. A deputy testified that Schutte described the incident to him as follows:

> [S]he was driving southbound on Highway 13, she was eating French fries . . ., and she reached down to do something with the CD player when she looked back up she was swerving into the northbound lane of traffic and she tried to—seen a truck coming and tried to avoid it but she couldn't stop the swerving . . . . She told me she was going around 50 miles-per-hour . . . .

Schutte told another person at the scene that she "was

---

[5] We note that, in its quoted summary of the evidence it contends was sufficient to convict Schutte of violating WIS. STAT. § 940.10, the State does not expressly rely on evidence of Schutte's marijuana use on the evening in question. We discuss the marijuana evidence in a subsequent section of our analysis.

sorry that she was driving too fast for conditions," and she told a volunteer firefighter "that it was all her fault and that she was going too fast and that she wasn't paying attention and that she was looking for a CD."

¶ 33. According to a passenger in the truck that Schutte's car collided with, Schutte's vehicle was going "pretty fast" and "faster than the speed limit" before the collision; he did not see Schutte's brake lights come on or her car slow down; and he did not see her car "fishtail" or go onto the highway shoulder prior to the collision. An emergency responder who was familiar with the highway said that he "always felt" the curve where the collision occurred "was a dangerous corner." A paramedic who arrived at the scene to treat victims of the crash described the weather conditions as "really bad at the time . . . . It was snowing, blowing snow at the time." He estimated the snow depth as "any[]where from three, four, to six inches of snow in places." An ambulance driver said that he regarded forty-five miles an hour as a "safe and prudent speed" that evening.

¶ 34. In sum, we conclude that the State presented sufficient evidence for jurors to reasonably conclude, beyond a reasonable doubt, that Schutte's conduct prior to the collision was criminally negligent within the meaning of WIS. STAT. §§ 939.25 and 940.10. The State's evidence established not only that Schutte's car crossed the highway centerline, but from the evidence the State presented, jurors could also reasonably conclude that Schutte was driving too fast for prevailing weather and road conditions, and, while on a curve in the highway, she attempted to engage in other tasks and took her eyes off the road and one hand off the steering wheel. We conclude the evidence at trial, viewed most favorably to the conviction, was such that jurors, acting reasonably, could have determined, be-

yond a reasonable doubt, that Schutte engaged in conduct that she should have realized "create[d] a substantial and unreasonable risk of death or great bodily harm to another." *See* § 939.25(1).

*Court's Instruction During Defense Closing Argument*

¶ 35. During closing arguments, defense counsel said the following, to which the State objected: "Now we heard French fry, we heard CD, we heard a few things. Bottom line is the State's got to prove which of these things caused the accident." In response to the State's objection, the trial court stated "[t]hat's an incorrect statement of the law and I'm going to instruct the jury on that issue." The court then instructed jurors as follows based on this court's decision in *Johannes*, 229 Wis. 2d 215:

> Jurors, in the case of [*Johannes*] . . . , the Court of Appeals case from 1999, the Court was dealing with a case where somebody had crossed the centerline, in that case the defendant had given inconsistent versions of what caused him to cross the centerline. The defendant said at one point he must have fallen asleep. Another point he was changing the radio. When convicted the defendant appealed saying that the jury wasn't unanimous because they didn't decide specifically which of those two things he was doing, and the Court of Appeals ruled a jury generally does not have to agree on the way a defendant participated in a crime but only must agree that the defendant committed the crime. "We are not persuaded. As we have previously stated, the criminally negligent act in this case was when Johannes drove across the highway's centerline. The jury only had to unanimously conclude that Johannes committed this criminally negligent act; the jury was not legally required to unanimously agree

280

about why he committed the act. Because we determine that whether Johannes was asleep or adjusting the radio are only different means or ways of committing a criminally negligent act and are not the criminally negligent act, we need not address his claim that sleep can be a legal defense to this crime."

So, the bottom line here is the State does not have to prove whether there was a French fry, whether it was a CD, whether it was something else.

However, I will caution the jury that even if the State proves that the defendant operated her vehicle on the left half of the roadway in violation of that statute it does not necessarily constitute criminal negligence. You may consider the violation if you find one, along with all the other evidence, in determining whether the defendant's conduct constituted criminal negligence.

¶ 36. Schutte claims the trial court erred in giving the quoted instruction during her counsel's closing argument. She contends the court's instruction "constitute[d] a judicial endorsement of a finding of guilt based on the mere fact [that] defendant's vehicle crossed the centerline." According to Schutte, the court's instruction in this case had the same effect as the instruction that triggered reversible error in *State v. Dyess*, 124 Wis. 2d 525, 370 N.W.2d 222 (1985). The trial court in *Dyess* had instructed jurors as follows: "The safety statute in the motor vehicle code provides that, no person shall drive a vehicle at a speed in excess, and on 14th Street in particular, of 30 miles per hour. *Any speed in excess of that limit would be negligent speed regardless of other conditions.*" *Id.* at 531. The supreme court reversed after concluding that the challenged instruction constituted prejudicial error because it was "tantamount to directing the jury to bring in a finding that was essential to the determination of guilt." *Id.* at 534.

¶ 37. Schutte contends that, because the fact her car had crossed the highway centerline "could not be seriously disputed," the trial court's reading to jurors the excerpt from *Johannes* saying that "the criminally negligent act in this case was when Johannes drove across the highway's centerline" effectively endorsed a guilty verdict at her trial. We disagree. A trial court has broad discretion to decide when to give a curative instruction and what it should contain. *See State v. Lombard*, 2003 WI App 163, ¶ 18, 266 Wis. 2d 887, 669 N.W.2d 157. " 'If the overall meaning communicated by the instructions was a correct statement of the law, no grounds for reversal exist.' " *Id*. (citation omitted). We conclude that the challenged curative instruction did not incorrectly state the law, and further, that it constituted neither a "judicial endorsement" of a guilty finding nor an impermissible directed verdict.

¶ 38. We first note that the *Johannes* excerpt the trial court read to jurors was not from the portion of our opinion where we discussed the sufficiency of the evidence, but from our discussion of whether jurors need to be unanimous regarding the specific act or acts of the defendant that constituted criminal negligence. *See Johannes*, 229 Wis. 2d at 227–29. As the excerpt read to jurors in this case notes, we concluded jurors need *not* be unanimous regarding why a defendant committed a criminally negligent act, only that he or she did so. *See id*. at 229. Schutte does not argue that *Johannes* is wrong on this point or that it was inappropriate for the trial court in this case to correct any misimpression regarding the State's burden of proof jurors might have gained from defense counsel's argument. We conclude the court did not misstate the law regarding the State's burden of proof or the proper application of the unanimity requirement to the evidence adduced at trial.

¶ 39. As for Schutte's claim that the particular passage from *Johannes* that the trial court read to jurors was tantamount to a judicial endorsement of a guilty verdict, we would find greater merit in the claim had the trial court not concluded its curative instruction with the paragraph that it did. The final paragraph of the instruction emphasized to jurors that Schutte's operation of her vehicle on the left half of the roadway did *not* necessarily constitute criminal negligence, and it informed jurors for a second time that they should consider the traffic violation, if they found one, "along with all the other evidence, in determining whether the defendant's conduct constituted criminal negligence." The court had also so instructed jurors as a part of its instructions on the elements of homicide by negligent operation of a vehicle, which the court read to jurors prior to the closing arguments of counsel.

¶ 40. Because the challenged instruction did not misstate the law, and because it avoided the infirmity of the instruction described in *Dyess*, we conclude that Schutte is not entitled to a new trial on the basis of the challenged instruction.

*The Marijuana Evidence*

¶ 41. Schutte contends the trial court erred by allowing the State to present testimony regarding her use of marijuana prior to the collision. She argues that this evidence was not relevant but, even if it was, its probative value was substantially outweighed by the danger of unfair prejudice. Schutte sought exclusion of the marijuana evidence in a pre-trial motion, which the trial court denied after hearing the proposed testimony of an expert, who was the supervisor of the Toxicology

283

Section of the Wisconsin State Laboratory of Hygiene. The court concluded that "the presence of an illegal controlled substance shows impairment, not to a specific degree, but some impairment. The decision whether or not to use a controlled substance and then drive certainly goes to the issue of negligence." The trial court also concluded the evidence was not "unduly prejudicial" and that it was "more probative than prejudicial."

¶ 42. The parties jointly called the Toxicology Section supervisor to testify as an expert at trial. She testified that testing of a blood sample taken from Schutte about three hours after the crash revealed no alcohol but showed "the presence of morphine, codeine, Delta-9–THC and its metabolites, Carboxy-THC." The expert explained that THC is the abbreviated term for tetrahydrocannabinols, an ingredient "in marijuana and or the metabolite of marijuana." She stated that the level of Delta-9–THC detected would have "some effect" on a person, but that "the degree of that effect has not been able to be established yet by research."

¶ 43. Although the expert could not determine the "level of impairment in Ms. Schutte," she explained:

> THC affects (sic) are mainly with the brain and they're mainly cognitive affects (sic). There are some driving skills that are affected because the skill depends upon direction from the brain in order for it to happen, such as complex reaction time, you need to first process information, make a decision, and then react.
>
> But the cognitive areas that THC affects are areas such as judgment and decision making, information processing, learning ability and short-term memory. It also affects a person's perception of time and space so that the ability to judge distances, speeds and relationship to other objects is also d[i]minished.

> Now, the motor abilities then that are affected as well include coordination and balance but also complex reaction time, concentration, and judgment . . . concentration as vigilance to task.[6]

In response to a question from Schutte's counsel, which asked the expert if she could "tell this jury . . . whether or not this marijuana had any ability to affect [Schutte's] ability to drive that vehicle safely," the expert again responded that she could not, adding that "[t]here could have been a slight affect (sic) or there could have been a great effect. Exactly which one, I do not know."

¶ 44. The toxicologist also testified to the levels of the substances found in Schutte's blood, and, applying recognized professional calculations, gave her opinion that Schutte had smoked marijuana "somewhere between 3 and 3.6 hours before the time of the blood draw," but that the use "could have ranged anywhere from two to six hours prior to the time of the blood draw."[7] As for the level of codeine detected, the expert said that the effect would have been "probably negligible."[8] She em

---

[6] Later in her testimony, the expert elaborated on "concentration and vigilance to task" as follows:

> [THC] does have a tendency for people to fixate their attention for a longer period of time on one type of task or another, whether it's looking out the window to check a building or putting in a CD, or what have you, that that is one of the areas that it does tend to affect is the time period that the attention is placed onto, that particular task is longer than what it would normally be under other conditions. In other words, they would normally complete the task faster and go back to check the driving conditions without THC present.

[7] The blood sample was taken from Schutte at 11:15 p.m. The collision occurred between 8:00 p.m. and 8:25 p.m.

[8] A witness testified that Schutte said in one account of her activities prior to the fatal collision that she had taken four teaspoons of cough syrup containing codeine some six hours prior to the collision.

phasized, however, that in contrast to impairment caused by alcohol, current research does not allow an analyst to determine the degree of impairment based on the level of THC detected in a person's blood.

¶ 45. We review a circuit court's admission of evidence to determine whether the court exercised appropriate discretion in admitting the evidence. *See State v. Hunt*, 2003 WI 81, ¶¶ 34, 42, 52, 263 Wis. 2d 1, 666 N.W.2d 771. We will sustain an evidentiary ruling if we determine the circuit court examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach. *See id.*, ¶ 34. The question before us "is not whether this court, ruling initially on the admissibility of the [disputed] evidence, would have permitted it to come in, but whether the trial court exercised its discretion" and whether "there is a reasonable basis for the circuit court's determination." *Id.*, ¶ 42.

¶ 46. Although both parties discuss the evidentiary issue as one involving "other acts" under WIS. STAT. § 904.04(2), neither addresses whether the State offered the evidence of Schutte's marijuana use on the evening in question "for a permissible purpose," which is the first of three inquiries required under *State v. Sullivan*, 216 Wis. 2d 768, 772–73, 576 N.W.2d 30 (1998). *See Hunt*, 263 Wis. 2d 1, ¶ 32. Accordingly, and because Schutte does not appear to have expressly argued in the trial court that the evidence was not offered for a permissible purpose under § 904.04(2), we proceed to the second *Sullivan* inquiry, whether the trial court properly concluded the evidence was relevant to the State's prosecution of Schutte for violating WIS. STAT. § 940.10.

¶ 47. Schutte argues that evidence she had "smoked some marijuana earlier in the day was irrelevant" because there was no "evidentiary link or nexus between [her] marijuana use and her ability to drive safely." Thus, in Schutte's view, it cannot be said that this evidence "made it 'more probable' that [she] was driving in a criminally negligent fashion," thereby inviting jurors to merely speculate as to the impact of her marijuana use, without the benefit of expert testimony to guide them. We disagree.

¶ 48. Although the toxicology expert could not tie the level of THC detected in Schutte's blood to a specific level of impairment, she noted at trial that "some driving skills . . . are affected" including judgment, reaction time and information processing. She also noted that THC "affects a person's perception of time and space so that the ability to judge distances, speeds and relationship to other objects is also d[i-]minished," and, further, that coordination, balance and concentration are also affected. Finally, she explained that THC "does have a tendency for people to fixate their attention for a longer period of time on one type of task or another, whether it's looking out the window to check a building or putting in a CD." These effects all relate directly to a person's ability to safely drive a motor vehicle. Despite the lack of testimony that Schutte experienced any of these effects prior to the collision, jurors, without speculating on Schutte's precise level of impairment, if any, could reasonably conclude from the expert's testimony that Schutte's use of a substance capable of producing these effects, while (or immediately prior to) driving on a rural highway at night in adverse weather and road conditions, was a circumstance rendering it more probable that her conduct was criminally negligent.

¶ 49. We thus conclude the trial court did not erroneously exercise its discretion in determining that the evidence of Schutte's marijuana use on the evening in question, together with the expert testimony noted, was relevant to the prosecution of the charged offenses because it tended to make it more probable that Schutte engaged in conduct that she should have realized "created a substantial and unreasonable risk of death or great bodily harm to another." *See State v. Richardson*, 210 Wis. 2d 694, 707, 563 N.W.2d 899 (1997) ("This court has . . . recognized that relevance is defined broadly . . . . Thus, there is a strong presumption that proffered evidence is relevant.").[9]

¶ 50. Schutte also criticizes the trial court's consideration of the legislature's enactment of WIS. STAT. § 346.63(1)(am) when ruling on the admissibility of the marijuana evidence. The relatively new statute makes it illegal, within the statute prohibiting operation of a motor vehicle while under the influence of an intoxicant, for a person to drive with "a detectable amount of

---

[9] The trial court observed that the expert's inability to correlate Schutte's THC level to any specific level of impairment or to state definitively that her ability to safely drive her vehicle had been affected went more to the weight of the marijuana evidence than to its admissibility: "The jury can consider it for what it's worth. They will determine the weight to give to this information." Schutte's counsel sought to establish from witnesses at trial that, both before and after the collision, Schutte had not exhibited signs of being impaired or under the influence of a controlled substance. Her attorney highlighted this evidence in closing argument, as well as emphasizing the toxicologist's inability to testify that Schutte's driving ability was affected by her marijuana use on the evening in question.

a restricted controlled substance in his or her blood."[10] The trial court viewed the legislature's enactment of § 346.63(1)(am) as "a decision on their part that in-[]deed this [operating a vehicle with a detectable amount of controlled substance in one's blood] is relevant" to the present prosecution. Schutte's complaint is that the enactment of a new "strict liability" offense for driving with a detectable amount of controlled substance in one's blood does not "automatically transform the detection of THC in a motorist's blood into relevant evidence of criminal negligence." She notes that the new statute says nothing about driving impairment, and she asserts that the statute serves simply as an additional deterrent to the use of substances that were already illegal. Although we agree with Schutte that § 346.63(1)(am) does not speak directly to what evidence is relevant to prosecutions under WIS. STAT. § 940.10, we cannot conclude that the trial court's consideration of the new statute rendered erroneous its overall determination that the marijuana evidence was relevant to the present prosecution.

¶ 51. Our final inquiry regarding the admission of the marijuana evidence is whether the trial court erred in determining that the probative value of the challenged evidence was not substantially outweighed by the danger of unfair prejudice. See WIS. STAT. § 904.03. As the opponent of admitting the marijuana evidence, Schutte bears the burden of showing that the danger of unfair prejudice to her defense by allowing jurors to hear the evidence substantially outweighed its probative value. See Hunt, 263 Wis. 2d 1, ¶ 53.

---

[10] WISCONSIN STAT. § 346.63(1)(am) became effective on December 19, 2003, after the date of Schutte's offenses (February 21, 2003) but before her trial in April 2004.

¶ 52. Schutte does not expressly argue that the marijuana evidence had little probative value. Presumably, however, because she argues it was irrelevant, she implicitly contends that, for the same reason, the probative value of the marijuana evidence was slight. Schutte thus implicitly maintains the marijuana evidence was not probative of the nature of her conduct at the time of the fatal collision because the expert witness who testified at trial could not say with certainty that her marijuana use prior to the collision impaired her ability to safely drive her vehicle. We conclude, however, that the absence of such testimony is largely offset by the temporal proximity of Schutte's marijuana use to the fatal collision.

¶ 53. The coroner testified that Schutte told her that she had taken a "few hits" of marijuana while driving "towards Mellen." Another witness said Schutte told her that the collision occurred just after "she passed the bowl [of marijuana] behind her." The toxicologist testified that the testing of Schutte's 11:15 p.m. blood sample showed that she most likely had used marijuana 3 to 3.6 hours earlier, thereby placing the use virtually at the time of the collision (between 8:00 and 8:25 p.m.) or immediately prior to it. Thus, even though the State could not establish the precise level of Schutte's impairment, if any, her decision to drive her car under the extant road and weather conditions while (or shortly after) using a substance capable of producing the effects the toxicologist testified to, was highly probative of whether Schutte should have realized the risks of serious harm to others that her conduct created.

¶ 54. As for the danger of unfair prejudice to Schutte's defense from admitting the marijuana evidence, we do not doubt that the evidence was prejudicial to Schutte's defense. As we have discussed, the mari-

juana evidence tended to render it more probable that she had engaged in criminally negligent conduct than would have been the case without that evidence.[11] The evidence's tendency to support a guilty verdict, however, does not render it *unfairly* prejudicial. *See State v. Veach*, 2002 WI 110, ¶ 87, 255 Wis. 2d 390, 648 N.W.2d 447 ("Unfair prejudice results when the proffered evidence has a tendency to influence the outcome by improper means or if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case.")

¶ 55. Schutte attempts to persuade us in a one-paragraph argument that the marijuana evidence was unfairly prejudicial because "jurors may have voted to

[11] As we have noted (see footnote 5), the State does not cite the marijuana evidence in summarizing the evidence at trial that it claims was sufficient to sustain the jury's guilty verdicts. The State does not, however, contend that, if the trial court erroneously admitted the marijuana evidence, the error was harmless, and with good reason. We count a dozen or so references in the prosecutor's closing arguments to Schutte's marijuana use on the evening in question. For example, in one segment of his argument, the prosecutor told jurors that Schutte had played "Russian roulette with her life, with the lives of her passengers," and that "[w]hen she decided to smoke marijuana she put a bullet in that chamber." (Other "bullets" included her decisions to "drive too fast for conditions on snow covered and slippery roads," to not "pay attention to the road as she's going around that corner," and to take "her eyes off the road and her hand off the wheel.") We would thus be hard pressed to conclude on this record that the marijuana evidence played no role in the jury's reaching the verdicts it did. We need not consider the question, however, given our conclusion that the trial court did not err in admitting the marijuana evidence.

convict not because they were necessarily convinced beyond a reasonable doubt that [Schutte]'s driving constituted criminal negligence, but because they believed as a pot smoker involved in a tragic collision she deserved to be punished." The trial court, however, concluded otherwise, saying, "I think we have to put some faith in our jury system and believe that the jury will listen to all of the evidence and consider all of the circumstances and won't stop and just say, " 'Oh, she smoke[d] marijuana, she's guilty.' " We conclude the trial court did not erroneously exercise its discretion in concluding that the evidence Schutte smoked marijuana on the evening in question, while prejudicial to her defense against the State's allegations of criminal negligence, is not the type of evidence likely to evoke horror or revulsion from jurors, prompting them to ignore the remaining evidence that her conduct either was or was not criminally negligent.

¶ 56. In sum, based on the testimony at trial, Schutte's marijuana use was part and parcel of the circumstances under which Schutte was driving that jurors were instructed to consider when determining whether her conduct was criminally negligent. We conclude the evidence was highly probative of the central issue in the prosecution, and its probative value was not substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court did not err in admitting evidence of Schutte's marijuana use prior to the collision.

■■■

¶ 57. Finally, Schutte contends that, even if the marijuana evidence was properly admitted, the trial court erred in not giving a "conditional relevance" instruction similar to Wis JI—Civil 1035 (2006).[12] She

---

[12] Wis JI—Civil 1035 provides as follows:

maintains that jurors should have been told that they should not consider the evidence of Schutte's marijuana use unless they first concluded that the use affected or impaired her ability to drive safely. Recognizing that any error in the failure to give such an instruction was waived by her failure to request it, Schutte asks us to exercise our discretionary power under WIS. STAT. § 752.35 to order a new trial in the interest of justice because "the real controversy was not fully tried." We decline to do so. We acknowledge that jurors could not determine from the trial testimony whether Schutte's ability to safely drive her car was "impaired to an appreciable degree" on account of her marijuana use. *See* WIS JI—CIVIL 1035. We are not persuaded, however, that the real controversy was not fully tried simply because jurors were permitted to consider the evidence of Schutte's marijuana use and its potential effects, together with all of the other circumstances under which she was driving, in determining whether she had engaged in criminally negligent conduct that caused three deaths.

*Prosecutor's Comments During Closing Arguments*

¶ 58. Finally, Schutte argues that certain comments by the prosecutor during closing arguments

In answering the question(s) of the verdict relating to the negligence of any party, you are not to consider a person's drinking of intoxicants before the accident unless you determine that the intoxicants consumed affected the person to the extent that the person's ability to exercise ordinary care (in the operation of the vehicle) (and) (or) (for the person's own safety) was affected or impaired to an appreciable degree. A person who voluntarily consumes intoxicants must use the same degree of care in the operation of a vehicle or for his or her self-protection as one who has not consumed intoxicants.

violated her right to due process and a fair trial, and, accordingly, we should order a new trial in the interest of justice. The first allegedly objectionable statements by the prosecutor dealt with "accountability" and occurred during his first closing argument:

When people in our community accept a license to drive a vehicle, they accept responsibility for their acts behind a wheel. With that responsibility comes accountability. Accountability for grabbing the keys. Accountability for picking up your friends. Accountability for smoking marijuana in the car. Accountability for driving too fast for conditions on snow covered and slippery roads. Accountability for looking down and picking up a CD or French fry, not paying attention to the roads in an extremely dangerous curve. Accountability for causing a car crash. And accountability for taking the lives of three children. Three children that didn't have to die. Three children with hopes, with dreams, with aspirations, with goals. That senselessly died on February 21st for no reason. All she had to do was slow down. Keep her hands on the wheel.

Although Schutte did not object to the foregoing comments at trial, she now claims they were improper because they invited "jurors to step beyond their role as finders of fact to serve as moral judges of the accused's conduct as a whole."

¶ 59. Schutte also cites the following comments, to which she did object, made during the State's rebuttal argument:

In a few moments you're going to hear the last instruction from the judge. He's going to tell you in the closing instruction that you'll not be swayed by sympathy, prejudice or passion. You've had a chance to sit here for five days, you've been able to see a lot of emotion from [Schutte] and her family. Now, I would submit to you that that emotion is real and those tears are real

but I ask you to decide this case on the facts. I ask you to not to be swayed by sympathy. Not sympathy for [Schutte]. Not sympathy for mothers who will never hold their children again. Whose kids don't have a chance to cry. Not sympathy for them and not sympathy for these kids . . . . [names the victims] Not sympathy for these three who will never laugh again, never have a chance to stand before you and cry—

[objection made; court instructs prosecutor to "Finish up, please."]

I will.

Don't feel sympathy for these three that they lost their lives. I ask you to decide this case on the facts that have been presented to you and not be swayed by sympathy.

. . . .

. . . [T]his case is important because the twelve of you represent the morals, the values, and the standards of our community.

In your verdict in this case send a message to our community—

[objection made and overruled]

Send a message to our community as to what the appropriate standards are for driving.

¶ 60. Schutte complains that, by making the foregoing arguments, the prosecutor "engaged in a backdoor appeal for sympathy for the victims and their families" and inappropriately encouraged "jurors to weigh broader public policy considerations in reaching their verdict." Although Schutte did object to the prosecutor's rebuttal arguments quoted above, she did

not move for a mistrial on the basis of those arguments. She thus waived appellate review of the alleged errors. *See State v. Davidson*, 2000 WI 91, ¶ 86, 236 Wis. 2d 537, 613 N.W.2d 606. Schutte attempts to avoid her waiver by asking us to grant her a new trial in the interest of justice on account of the cited arguments. We decline to do so because we conclude the prosecutor's comments did not rise to the level of "plain error" that " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *See id.*, ¶ 88.

¶ 61. The State points out that, in denying Schutte's motion for postconviction relief, the trial court observed that the prosecutor's discussion of "sympathy" in his rebuttal was largely a counter to defense arguments regarding the impact the "accident" had on Schutte. For example, defense counsel told jurors, "And I would ask you to consider [Schutte], who's a victim in this accident also. She was seriously injured. She lost her boyfriend. She lost her best friend and lost another friend. No matter what the verdict is, she won't move on from this." The State also notes that courts in other states have concluded that it is not improper argument for a prosecutor to appeal to jurors to "send a message to the community" or to hold a defendant "accountable."[13]

---

[13] *See, e.g., Jowers v. State*, 613 S.E.2d 14, 17 (Ga. Ct. App. 2005) (" 'It is not improper for a prosecutor to appeal to the jury to convict for the safety of the community, or to stress the need for enforcement of the laws and to impress on the jury its responsibility in that regard.' "); *State v. Collins*, 150 S.W.3d 340, 354 (Mo. Ct. App. 2004) ("The State may argue that the jury should 'send a message' that society will not tolerate certain conduct."); *People v. Howell*, 831 N.E.2d 681, 692 (Ill. Ct. App. 2005) (not error for a prosecutor to ask jurors to "hold[] the

¶ 62. There is no question that this was an emotional case, the trial having dealt with a tragic event that affected many lives, a sad truth of which jurors were aware before they heard the arguments of either counsel. We cannot conclude that the prosecutor's comments challenged by Schutte were so beyond the bounds of acceptable closing argument that we should exercise our discretionary authority to order a new trial. We exercise our authority to reverse in the interest of justice under WIS. STAT. § 752.35 sparingly and only in the most exceptional cases. *See State v. Cuyler*, 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983). We are not persuaded this is such a case.

## CONCLUSION

¶ 63. For the reasons discussed above, we affirm the appealed judgment and order.

*By the Court.*—Judgment and order affirmed.

defendant accountable for his actions"); *Commonwealth v. Wheeler*, 645 A.2d 853, 859 (Pa. Super. Ct. 1994) (not error for a prosecutor to tell jurors that "defendants should be held 'accountable to the law of a civilized people.' ").