COURT OF APPEALS
DECISION
DATED AND FILED

August 23, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1169-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF500

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

ERIC L. PHILIPSEN,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Outagamie County: MITCHELL J. METROPULOS, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Eric L. Philipsen appeals from a judgment convicting him of second-degree sexual assault with use of force in violation of

WIS. STAT. § 940.225(2)(a) (2019-20).[1] He also appeals from a circuit court order denying his motion for postconviction relief. Philipsen seeks a new trial, arguing that defense counsel[2] was constitutionally ineffective for several reasons and that the real controversy was not fully tried. We reject Philipsen's arguments and affirm.

## BACKGROUND

¶2 In 2016, the State charged Philipsen with one count of second-degree sexual assault with use of force for an incident that occurred on November 13, 2010. On that date, Darcy[3] reported to police that she had been walking westbound on the College Avenue Bridge in Appleton, Wisconsin, when a man grabbed her from behind "in a bear hug type fashion." At Philipsen's jury trial, Darcy testified that the man "threw [her] down on the sidewalk" and began "groping" her breasts with "both hands up underneath [her] shirt and bra." Darcy fought back, attempted to scream for help, and continued to struggle with her assailant, who was stronger and overpowered her. At one point during the attack, Darcy explained that the man "held [her] down on [her] back with one arm, and that's when [she] saw him go for his pants and heard his belt jingle," like "[h]e was trying to undo his pants."

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] We refer to Philipsen's trial counsel as "defense counsel" and to his counsel on appeal as "postconviction counsel."

[3] Pursuant to the policy underlying WIS. STAT. RULE 809.86, we use a pseudonym when referring to the victim and also omit other personally identifying details, including using a pseudonym for Darcy's then-boyfriend.

2

¶3      In response, Darcy testified, she fought back harder, was "yelling and screaming," and "attempted to claw at his eyes and shoved [her] hands down his throat." According to Darcy, in her "mind [she] was going to rip his face off," so she "was vividly sticking [her] fingernails into his eye sockets and mouth." She succeeded in getting her fingers in her assailant's mouth and was "grabbing his bottom jaw." She thought she "must have kind of hurt him in some way" because she was then able to flip onto her stomach, get to her hands and knees, and grab a metal railing. Darcy testified, "When I got to my hands and knees, his arms kind of went around my waist, and that's when he said, 'Please, no, this will only take a minute,' and I just pulled myself up, and, as soon as I got up, he turned and walked away." Darcy then turned and ran across the bridge in the opposite direction. According to Darcy, the entire encounter was "very quick," possibly lasting "less than 30 seconds."

¶4      When Darcy made it to the end of the bridge, she contacted the police. Law enforcement responded and began an investigation. Detective Chue Lee Thao with the City of Appleton Police Department was the lead investigator on the case. Darcy provided a written statement, answered the officers' questions, and had photographs taken of her clothing and a "couple little scrapes" on her hands. Additionally, Darcy's hand, which she alleged was in the assailant's mouth, was swabbed for DNA.[4]

¶5      Darcy reported to police that earlier in the evening she had gone bowling with her boyfriend, Mark, and that they later met up with friends at the

---

[4] Darcy testified that the DNA swab was taken after she used the restroom and washed her hands at the police station.

Wishing Well Bar near the College Avenue Bridge. At trial, Darcy testified that she decided to leave the Wishing Well because she was mad at Mark after he left her "alone" at the bar for about forty-five minutes while "he went to talk to his ex-girlfriend," and the ex-girlfriend then approached Darcy and had a "verbal confrontation." After leaving the bar, Darcy "zig-zagg[ed]" on the city streets and "cut through the middle of the railroad tracks and onto the residential streets" to get to the College Avenue Bridge. She also testified that she contacted a male friend, who was planning to meet her when she got over the bridge.

¶6 On the evening of the incident, Darcy described the assailant to the police as "a white male, between 5'4" and 5'7", with short medium light hair, a handlebar mustache and no hair on his chin." As part of the police investigation, Darcy spoke with a sergeant who prepared a composite sketch based on Darcy's description of her assailant. The sergeant testified, based on his records, that Darcy described her assailant's "Most Outstanding Feature" as a "beard," and he wrote "[p]encil beard along jaw" on the form documenting Darcy's description. The sergeant testified that he reported to Thao that when Darcy later reviewed the sketch, she was not "convinced that was the image, but it was the best that she could come up with at the time." Conversely, Thao testified that Darcy "stated to [him that] she was satisfied with the sketch, that it captured the image or resembled the person that attacked her on November 13th."

¶7 At trial, Darcy reiterated that her attacker was "[a]bout [her] height, lighter brownish hair, and not a heavyset man, he was not, like, overweight. Average build, I guess." She guessed at his age, stating that he was in his forties. She again noted that she "thought [she] had seen some facial hair," describing it as "a thin section of hair along the sides of the jaw line" with no hair on his chin, but she was "not sure" about any hair on his upper lip. Darcy testified, however, that

4

she did not "get a good look at him" because "it was very dark and shadowy under the shadow of the concrete barrier" on the bridge, the attack was "[v]ery quick," and she "was solely focused on getting away from this person."

¶8    In 2016, the Wisconsin State Crime Laboratory matched Philipsen's DNA profile with DNA previously recovered from swabs taken from Darcy's right hand during a "routine search of the state level CODIS."[5]  Officers then learned that Philipsen lived near the College Avenue Bridge where the attack occurred, and he was identified as a potential suspect.  As part of its investigation, law enforcement collected Philipsen's DNA to compare it to the DNA collected from Darcy's hand.  At trial, Amanda Hahn, a DNA analyst from the Wisconsin State Crime Laboratory, testified that she developed a DNA profile based on swabs from Darcy's index and middle fingers.  She explained that both samples "had a mixture with a major male contributor profile."[6]  Based on her testing, she determined that "[t]he DNA from the evidence was consistent with [Philipsen's] DNA."

---

[5] "To compare DNA profiles electronically, Wisconsin uses a tool called the Combined DNA Index System, or CODIS, which is managed by the Federal Bureau of Investigation." WISCONSIN DEPARTMENT OF JUSTICE, DNA Databank https://www.doj.state.wi.us/dfs/dna/dna-databank (last visited August 18, 2022).  "CODIS includes DNA profiles collected from known convicted offenders and arrestees, as well as, unknown missing persons, unidentified human remains, and crime scene evidence."  *Id.*  "When a match occurs, the DNA Databank executes a series of steps to confirm the information and DNA profiles and then provides the identifying information to law enforcement as an investigative lead."  *Id.*  In this case, the DNA analysis report indicated a male profile as a "major contributor," but "the initial search against state and local databases revealed no matches."

[6] Hahn explained that the "mixture" meant that "there are at least two people in the profile, total, but one person is contributing more DNA than the other person."  She stated that she did not "receive any additional standards," so she was unable to determine the identity of the additional contributor.

¶9      At trial, Philipsen admitted to encountering Darcy on the bridge, but his version of events was markedly different than Darcy's. Philipsen testified that on the evening of November 13, 2010, he was walking his dog when he observed a woman, who was later identified as Darcy, on the bridge. Philipsen stated that

> she was walking towards me, and she seemed distraught … she appeared to be talking with her hands and sobbing, and so as I approached her I asked her a question, which I don't remember the exact words, I think I said, "Do you need help?," or "Are you okay?"

At that point, Philipsen reported that Darcy "said, 'Get away from me,' and she shoved [him]." Philipsen testified that Darcy "was frantic when she pushed [him], her hands slid up, and at least one of her hands hit [him] in the chin." According to Philipsen, he "didn't bleed, but even the next day [he] could feel a little spot where something had poked [him] in the chin." Philipsen responded, "Well, fuck you, then," and continued across the bridge and returned home. On his way home, Philipsen testified that he encountered a police car, which paused to allow him to cross the road, and then waited longer than necessary before continuing on.[7] Philipsen stated that he told his live-in girlfriend at the time about the encounter, which she corroborated during her own testimony at Philipsen's trial.

¶10     Important to Philipsen's defense, Darcy stated that she did not recognize Philipsen and could not say whether he was the person who attacked her. Accordingly, Philipsen's counsel focused at trial on the inconsistencies in

---

[7] This point in Philipsen's testimony was important because one of the first officers on the scene testified that he was asked on the phone whether "the suspect had a dog." He asked Darcy, who responded, "[N]o," and he relayed that information to the other officer. Philipsen's defense counsel argued that this interaction corroborated Philipsen's version of events, as Philipsen claimed that the officer observed him walking his dog that evening, which is why the question was asked, and it explained the officer's long pause at the crosswalk.

Darcy's initial and trial descriptions of her assailant and how they differed from Philipsen's appearance. Philipsen presented evidence from his ex-wife, a co-worker, and his former roommate that Philipsen did not have any facial hair during the time period when the assault occurred.[8] Philipsen himself testified that in November 2010, he was 6'0" to 6'1" tall, weighed 200 pounds, and did not have a beard. In fact, Philipsen testified that he dislikes beards.

¶11 Philipsen also testified that he has a mole on his face near his lip and nose. The presence of Philipsen's mole was particularly important to his defense, and it was something defense counsel highlighted in his closing argument. There was disagreement as to whether Darcy mentioned the presence of a mole on her attacker's face during the multiple times she met with law enforcement soon after her attack. Darcy testified at trial that when her attacker first grabbed her, she thought it was her friend that she was planning to meet up with. However, when she "turned to look to try to see," she saw that the attacker had a "mole on his right cheek," and she knew it was not her friend. Darcy agreed, however, that she did not tell the first responding officer about a mole on her assailant's face. Darcy did testify that she told the composite sketch artist about the mole on her attacker's face. Yet, she admitted that the composite sketch she helped create does not have a mole on it. Further, the sergeant who prepared the sketch testified that he would have included the mole on the composite sketch if he had been provided that information.

---

[8] These witnesses also testified that Philipsen regularly walked his dog during this time period.

¶12 When asked if she told Thao—whom she met with multiple times during the course of the original investigation—about the mole, Darcy did not remember if she initially told him that there was a mole on her attacker's cheek. She admitted, however, that when Thao showed her a picture of Philipsen in 2016, "that's when [she] said [she] recognized the mole." For his part, Thao testified that while he asked Darcy about "distinctive facial markings," she did not indicate to him the presence of a mole during the initial investigation. Instead, Thao agreed that Darcy shared the information about the mole with him "after [law enforcement] developed a suspect" in 2016. He testified, however, that in his experience it is "sometimes common that victims will have spontaneous memories like that."

¶13 During closing arguments, Philipsen's counsel also highlighted certain discrepancies in Darcy's story of her attack based on his cross-examination of the witnesses. For example, counsel asked the jury to consider how, despite the violent nature of the assault Darcy described, her clothing was dry even though the ground was wet from an earlier rain, her clothes were not dirty, her glasses did not fall off, and none of her belongings in the front pocket of her hooded sweatshirt fell out. Counsel also emphasized during Thao's cross-examination that Thao had difficulty getting Darcy to return to speak with him and confirm the sketch of the assailant.

¶14 The jury found Philipsen guilty of second-degree sexual assault with use of force, and the circuit court sentenced him to ten years' initial confinement followed by five years' extended supervision. Philipsen filed a postconviction motion for a new trial based on ineffective assistance of defense counsel and

newly discovered evidence.[9] He also sought a new trial in the interest of justice. Philipsen asserted that defense counsel was ineffective by failing to fully impeach Darcy by highlighting inconsistencies in her version of the attack and her level of intoxication. Further, Philipsen argued that defense counsel was ineffective for failing to challenge the State's DNA evidence, specifically the State's theory that the DNA came from saliva rather than touch DNA.

¶15 At a *Machner*[10] hearing, postconviction counsel called a defense DNA expert to challenge Hahn's testimony at trial. Hahn also testified, as did Philipsen's defense counsel, Thao, Philipsen's nephew, and Philipsen himself. After considering all the testimony, the circuit court denied Philipsen's motion, finding that defense counsel was not ineffective and that the nature of the DNA evidence—whether it was touch or saliva—had little significance in Philipsen's case. Further, the court denied Philipsen's request for a new trial in the interest of justice. Philipsen appeals. Additional facts are included in the discussion section where necessary.

## DISCUSSION

¶16 On appeal, Philipsen renews his arguments that defense counsel was constitutionally ineffective, and he also seeks a new trial in the interest of justice. A criminal defendant has the constitutional right to effective assistance of counsel. *State v. Sholar*, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89. To prevail on an ineffective assistance claim, a defendant must show both that counsel's

---

[9] Philipsen does not renew his claim of newly discovered evidence on appeal. Therefore, we do not discuss it further.

[10] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

performance was deficient and that the deficient performance prejudiced the defense. ***Strickland v. Washington***, 466 U.S. 668, 687 (1984).

¶17 To establish deficient performance, a defendant must show that his or her trial counsel's performance fell below an objective standard of reasonableness. ***State v. Breitzman***, 2017 WI 100, ¶38, 378 Wis. 2d 431, 904 N.W.2d 93. "In general, there is a strong presumption that trial counsel's conduct 'falls within the wide range of reasonable professional assistance.'" ***Id.*** (citation omitted). Moreover, we give "great deference" to counsel's strategic decisions. ***Id.*** (citation omitted); *see also* ***State v. Balliette***, 2011 WI 79, ¶¶25-26, 336 Wis. 2d 358, 805 N.W.2d 334 ("Importantly, counsel is 'strongly presumed to have rendered' adequate assistance within the bounds of reasonable professional judgment. A court must be vigilant against the skewed perspective that may result from hindsight, and it may not second-guess counsel's performance solely because the defense proved unsuccessful." (citations omitted)). In fact, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" on appeal. ***Strickland***, 466 U.S. at 690.

¶18 To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Sholar***, 381 Wis. 2d 560, ¶33 (citation omitted). However, "a defendant need not prove the outcome would 'more likely than not' be different in order to establish prejudice in ineffective assistance cases." ***Id.***, ¶44 (citation omitted).

¶19 The defendant has the burden of establishing both deficient performance and prejudice; thus, "reviewing courts need not consider one prong if the defendant has failed to establish the other." ***State v. Chu***, 2002 WI App 98,

¶47, 253 Wis. 2d 666, 643 N.W.2d 878. Whether an attorney rendered ineffective assistance is a mixed question of fact and law. *State v. Nielsen*, 2001 WI App 192, ¶14, 247 Wis. 2d 466, 634 N.W.2d 325. We will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* However, whether the facts establish ineffective assistance is a question of law that we review independently. *Id.*

¶20    Philipsen makes several arguments in support of his claim that defense counsel was constitutionally ineffective.[11] First, Philipsen argues that his counsel was ineffective by not presenting testimony of a defense DNA expert at trial and by not exploring alternative explanations for why Philipsen's DNA may have been on Darcy's hands. Second, Philipsen argues that his defense counsel erred by "downplaying" Darcy's level of intoxication. Third, along those same lines, Philipsen claims that defense counsel failed to adequately impeach Darcy with her prior statements and other evidence at trial. Fourth, Philipsen alleges that defense counsel was ineffective by both failing to challenge the number of prior convictions used to impeach him and failing to attempt to impeach Darcy with a prior operating a motor vehicle while intoxicated (OWI) conviction. Fifth, Philipsen claims that defense counsel was ineffective for failing to present two witnesses to the jury. For the reasons that follow, we conclude that Philipsen's defense counsel was not constitutionally ineffective.

---

[11] We agree with the State's assessment that Philipsen's arguments in his brief-in-chief are "unstructured and sometimes confusing," with his arguments as to defense counsel's ineffectiveness sometimes blending together. We have done our best to identify all of Philipsen's claims in order to address each one individually. However, to the extent that Philipsen makes any additional arguments that we have not explicitly addressed, they are deemed denied. *See Libertarian Party of Wis. v. State*, 199 Wis. 2d 790, 801, 546 N.W.2d 424 (1996) (an appellate court need not discuss arguments that lack "sufficient merit to warrant individual attention").

¶21 First, Philipsen argues that defense counsel was deficient by failing to present a defense DNA expert at trial to challenge the assertions of the State—specifically, that the DNA recovered on Darcy's hand was consistent with saliva rather than touch-transfer DNA. According to Philipsen, the testimony of a defense DNA expert would have answered the "ultimate issue": "whether Philipsen's DNA was present due to a brazen attack or incidental contact with an intoxicated/hysterical female fleeing her cheating boyfriend." He points to three unexplored points: (1) the DNA testing did not identify the source of the DNA; (2) there was an incomplete profile with multiple contributors presented to the jury; and (3) "the possibility that Philipsen's continual and vast exposure to the bridge including the night in question could be the source of the touch DNA found on [Darcy]."

¶22 At the *Machner* hearing, defense DNA expert Theodore Kessis testified about the DNA testing in Philipsen's case. Kessis explained that DNA testing does not identify the *source* of the DNA—i.e., skin, blood, semen, or saliva, which can only be identified through serological testing. Serological testing was not conducted in this case. Further, Kessis testified that the sample recovered from Darcy's hand contained a small amount of DNA, which was consistent with touch DNA rather than saliva. On cross-examination, Kessis conceded, however, that even if serological testing had been conducted and revealed the presence of saliva, the testing would not be able to tell who contributed the saliva. For example, in this case, the saliva could have come from the assailant or from Darcy coughing on her hand or wiping her own mouth. Kessis also agreed that the sample could have been smaller, and therefore more consistent with touch DNA, because Darcy had washed her hands after the

incident. Thus, he could not say for certain that it was consistent with touch DNA or saliva.

¶23     Hahn reaffirmed her prior testimony that Philipsen's DNA was "consistent" with the male contributor's DNA found on Darcy's fingers. When questioned about why she did not perform a test for saliva on the DNA sample, she explained that "people tend to put their fingers in their mouths" so "finding saliva or amylase on fingers wouldn't tell you whose saliva that was even in conjunction with a DNA test." Hahn further testified that after the trial, she tested the DNA sample against a buccal swab from Darcy, and based on this additional analysis, she was able to determine the two major contributors present in the DNA sample from Darcy's fingers: one was Darcy and one was Philipsen. Thus, there was no longer an unknown contributor to the DNA.

¶24     Philipsen's defense counsel also testified at the *Machner* hearing on the subject of the DNA evidence. Counsel explained that he did not think it was important to challenge the State's suggestion that the DNA was from saliva because "[i]t wasn't in dispute that his DNA was present." Defense counsel did not believe that he needed a DNA expert because both Darcy and Philipsen admitted they had physical contact so he "couldn't argue against it." Thus, defense counsel agreed that "it didn't matter from a strategy perspective what the DNA was from," and "whether or not it was DNA from her scratching him, from her putting her fingers in his eye, or from her saliva, the fact was that the DNA … was there."

¶25     In its decision on Philipsen's postconviction motion, the circuit court agreed that "[w]hether or not the DNA was touch DNA or a result of saliva DNA is not important" and "really didn't play a significant role" given that "the DNA

places Mr. Philipsen at the scene of the crime." Further, the court did not believe that if the State would have shown at trial that Darcy was the second, unknown contributor to the DNA sample from her hand "that would have played any role in the outcome of the trial." Thus, on the DNA issue, it neither found defense counsel's performance to be deficient nor did the court find that Philipsen was prejudiced.

¶26 Given our "highly deferential" standard of review and our instruction "to evaluate the conduct from counsel's perspective at the time," *see Breitzman*, 378 Wis. 2d 431, ¶65, we agree with the circuit court that defense counsel did not perform deficiently with respect to the DNA evidence. Defense counsel testified that, after an evaluation of the facts and circumstances of the case, he did not believe that a defense DNA expert was necessary as both Darcy and Philipsen stated that physical contact occurred, which explained the existence of Philipsen's DNA on Darcy. As the State argued, our analysis may have been different had Philipsen denied any contact with Darcy, which, as Philipsen suggested, would have required an expert to opine as to the possibility of Darcy collecting Philipsen's DNA in another manner.

¶27 The reasonableness of defense counsel's conclusion, under the circumstances of this case, is supported by Kessis' and Hahn's testimony. Both agreed that if the DNA sample had been tested for saliva, the DNA sample would not have indicated the source of the saliva because the test could very well have found that Darcy's own saliva was on her hand. Further, neither expert could opine with certainty that the sample size was consistent with saliva rather than touch DNA. While Kessis suggested that the small sample size was more

consistent with touch DNA, he admitted that the fact that Darcy washed her hands before the sample was taken could have impacted the sample size.[12] Under the circumstances, we conclude that defense counsel's decision not to challenge the DNA evidence with his own expert was a reasonable strategic decision entitled to our deference. *See Balliette*, 336 Wis. 2d 358, ¶26. Thus, we need not address prejudice.

¶28 Next, Philipsen argues that defense counsel provided ineffective assistance by downplaying Darcy's level of intoxication on the night of the assault. The jury heard Darcy's testimony that she had been drinking that evening—"five beers" over the course of "six or seven hours"—and she described herself as "slightly intoxicated" but said she had "[n]o difficulty walking." Thao also testified at trial that he was aware that Darcy had been drinking, but he also noted that she was able to answer questions appropriately, she "kn[e]w where she was, [and] at the police station she was able to make phone call[s] to and from people." Further, during his postconviction testimony, Thao explained that, based on his experience with OWI investigations, he was "not at all" concerned about Darcy's level of impairment that evening, and he then listed numerous indicators of intoxication that Darcy did *not* exhibit.

---

[12] As the State notes, Philipsen argues in his brief-in-chief that Hahn, at trial, "portrayed the low-level mixture of partial DNA profile detected on the fingers of [Darcy] as having originated from saliva and not as a result of casual or innocent transfer of DNA between the parties." We agree with the State that this is a misleading statement by Philipsen, as Hahn testified at trial unequivocally that she did not test for the presence of saliva in the DNA sample and that she could not determine whether the sample was from skin or saliva. We recognize that the State may have suggested that the DNA found on Darcy's hand was from saliva. However, statements of counsel are not evidence, and the jury was informed of that fact.

¶29   On appeal, Philipsen argues, however, that Darcy was "inebriated" as she was "slurred and disoriented."[13]   Further, Philipsen claims that Darcy was so intoxicated that she did not remember a phone call with Mark right before the attack and that an interview with Thao on January 5, 2011, provides other evidence of Darcy's intoxication.   According to Philipsen, had the jury known of Darcy's actual level of intoxication, the outcome of the trial would have been different.

¶30   Even if we were to agree with Philipsen and assume, without deciding, that Darcy was intoxicated on the evening of November 13, 2010, we conclude that Philipsen has failed to meet his burden to establish that defense counsel performed deficiently.   At the ***Machner*** hearing, defense counsel explained his strategy for downplaying Darcy's intoxication, referring to it as a

> touchy area because, one, she was clear enough to give a very detailed sketch, which I was using to my advantage; and I was cautious about saying she was so intoxicated she didn't know what she was doing because that gives her the excuse that she was wrong in her description that we were using to our advantage.   So I honestly downplayed her intoxication because of that reason.

---

[13] Philipsen points to evidence of Darcy's intoxication contained in "a video, not utilized" at trial, identified as Record 230, which he notes is "the squad video of the actual night in question which shows a vastly different victim than that which is portrayed at trial."   Philipsen calls this video "the single most important piece of evidence in the case, yet it was largely unexplored at trial."   The State argues, however, that we should not consider Philipsen's representations about the DVD's contents because Record 230 of the appellate record is an image of a DVD marked as Exhibit 25.   The actual DVD does not appear to have been transmitted to this court. Philipsen did move to supplement the record with a different DVD, but he later failed to respond to our request for additional information and, as a result, we denied his motion.   He did not likewise seek to supplement the record with the DVD marked as Exhibit 25.   The State also notes that Exhibit 25 does not appear to have been received into evidence at the postconviction hearing. *See* WIS JI—CRIMINAL 155 (2018) ("An exhibit becomes evidence only when received by the court.   An exhibit marked for identification and not received is not evidence.").   For purposes of our review, however, we will assume that Record 230 depicts that Darcy was intoxicated on the evening in question.

Defense counsel explained that Darcy gave police a very detailed description of her assailant on the evening of the attack and shortly thereafter, which did not match Philipsen, and counsel attempted to use that fact to Philipsen's advantage. He agreed that his "strategy was to downplay the intoxication because [he] wanted it to support the misidentification of the victim," which defense counsel highlighted to the jury in his closing argument.

¶31 We conclude that defense counsel's strategic decision fell within the wide range of reasonable professional assistance. We "will not second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment." *Breitzman*, 378 Wis. 2d 431, ¶65 (alteration in original; citation omitted). Here, defense counsel's strategy was to focus on Darcy's misidentification of Philipsen as her attacker given the detailed description that she provided to law enforcement—a detailed description that was inconsistent with Philipsen's appearance—which she could explain away by her level of intoxication, if that had been emphasized.

¶32 Under the circumstances, we cannot conclude that defense counsel's strategy was irrational or capricious. *See id.* While perhaps in retrospect, it would have been reasonable for defense counsel to have shown that Darcy was very intoxicated, the fact that a "strategy ultimately proved unsuccessful does not make it any less reasonable for purposes of evaluating [Philipsen]'s claim." *See State v. Maloney*, 2005 WI 74, ¶44, 281 Wis. 2d 595, 698 N.W.2d 583. Thus, Philipsen's defense counsel did not perform deficiently.

¶33 Relatedly, Philipsen faults defense counsel for his failure to adequately impeach Darcy based on her prior statements and inconsistencies in the evidence. Philipsen devotes a significant amount of his brief to arguing the many

17

ways that defense counsel could have impeached Darcy based upon her changing narrative. As best as we can discern, Philipsen asserts that Darcy first told law enforcement that her assailant "ran away," and then at trial she stated that he "walked" away; Darcy gave conflicting testimony regarding whether her assailant had a mole on his face; Darcy alleged she did not get a good look at her assailant's face, yet Philipsen argues she had plenty of opportunity to face her assailant and see his face based on her story of how the attack took place; Darcy was actually upset because she found out her boyfriend was sleeping with his ex-girlfriend; and, finally, Darcy's story of the attack did not "add up" because her clothing was not wet, despite her claim that she was thrown to the ground.

¶34 The circuit court determined that defense counsel's cross-examination of Darcy was not deficient. According to the court, counsel's "cross-examination of the victim was quite extensive and did go into many of these areas that [postconviction counsel] has brought up." Based on our review of the record, we agree. Defense counsel brought out many of these inconsistencies—and more—throughout the trial, and he focused on how these inconsistencies affected Darcy's credibility during his closing argument. The *Strickland* standard does not require that defense counsel address every piece of available evidence at trial in order to challenge a witness's credibility. "Counsel need not be perfect, indeed not even very good, to be constitutionally adequate." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305 (citation omitted). Thus, Philipsen has not demonstrated that defense counsel's impeachment of Darcy constituted deficient performance.

¶35 Next, Philipsen argues that defense counsel was ineffective by failing to challenge evidence concerning both Philipsen's and Darcy's prior convictions. WISCONSIN STAT. § 906.09(1) allows for the use of prior convictions

to impeach a witness. Evidence of a prior conviction may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice. Sec. 906.09(2). Philipsen claims the number of convictions for both Philipsen and Darcy was "important because it came down to the credibility of two competing narratives."

¶36 As to Darcy, she was never asked how many times she had been convicted of a crime while testifying at trial. According to Philipsen, defense counsel "stipulated" that Darcy had never been convicted of a crime, which he claims was an error.[14] Postconviction, Philipsen presented evidence that Darcy had pled no contest to OWI, second offense, in December 2010. In contrast, the State argues that "[t]he [circuit] court might well have excluded [Darcy's] 2010 OWI conviction because of the seven and one-half years' time from the offense date to the trial date, because it did not involve … dishonesty, and because it appears isolated and not part of a pattern of criminal convictions." *See* WIS. STAT. § 906.09(2); *State v. Driscoll*, 53 Wis. 2d 699, 708, 193 N.W.2d 851 (1972).

¶37 Even if we were to assume, without deciding, that defense counsel was deficient by failing to present evidence of Darcy's prior conviction, Philipsen has failed to establish prejudice. Generally, the failure to impeach a witness with

---

[14] The circuit court explained in its oral decision on Philipsen's postconviction motion that "the parties agreed that they would not count any traffic-related offenses." The court also noted what it described as "an incorrect statement in [postconviction counsel's] brief," which postconviction counsel also repeated in Philipsen's brief-in-chief before this court. According to Philipsen, "[e]vidence came in that Philipsen had three prior convictions and [Darcy], zero, when it should have been one." As the court observed, no evidence of Darcy's prior conviction was ever presented to the jury, so the jury was never told that Darcy had zero convictions. According to to the court, "[t]hat was never asked … of the witness. There just was no evidence with regards to prior offenses by the victim, and it was never asked of her if she's ever been convicted of a crime."

prior convictions will not be deemed prejudicial where the jury was presented with other evidence that (1) gives it reason to question the witness's credibility and (2) supports the defendant's guilt. *See State v. Trawitzki*, 2001 WI 77, ¶¶43-45, 244 Wis. 2d 523, 628 N.W.2d 801, *holding modified on other grounds by State v. Davison*, 2003 WI 89, ¶44, 263 Wis. 2d 145, 666 N.W.2d 1; *see also State v. Tkacz*, 2002 WI App 281, ¶24, 258 Wis. 2d 611, 654 N.W.2d 37.

¶38     Here, we conclude that defense counsel's failure to impeach Darcy with her prior conviction did not prejudice Philipsen. As addressed above, defense counsel provided the jury with other reasons to question Darcy's credibility, including differences between her description of her attacker's appearance and Philipsen's actual appearance, her failure to mention the mole on her assailant's face until 2016 after she saw a picture of Philipsen, the fact that the physical evidence was inconsistent with Darcy's description of the assault, and the fact that she was mad at Mark and was perhaps trying to get back at him. Further, there was physical evidence—Philipsen's DNA on Darcy—supporting Philipsen's guilt. Had the jury heard evidence that Darcy had previously been convicted of a crime, it would have only marginally added to defense counsel's attack on Darcy's credibility.

¶39     As to Philipsen's prior convictions, Philipsen alleges that on the date of the incident, November 13, 2010, he had no criminal convictions, while at the time of trial he had three: possession of THC and of drug paraphernalia in 2015 and "Prostitution-Sexual Gratification" in 2016.[15] At trial, when asked, Philipsen

---

[15] The information concerning Philipsen's prior convictions was contained in the presentence investigation report prepared prior to sentencing in this case.

testified that he had been convicted of a crime three times. Prior to trial, defense counsel agreed that Philipsen had three convictions for purposes of impeachment, and he testified at the *Machner* hearing that he did not think there might be a basis to reduce that number as his "view" was that convictions are considered "at the time of the testimony, not at the time of the offense."

¶40 Philipsen appears to suggest that he should not have been impeached with his three prior convictions because they occurred after the date of the offense at issue in this case.[16] His argument on this point is undeveloped. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). Further, the circuit court rejected Philipsen's argument, concluding that "[t]he rule with regards to prior offenses is not related to the date of the underlying offense. It's related to the date of the testimony." We agree. WISCONSIN STAT. § 906.09(1) provides, in part, that "[f]or the purpose of attacking character for truthfulness, a witness may be asked whether the witness *has ever been convicted of a crime or adjudicated delinquent* and the number of such convictions or adjudications." (Emphasis added.) There is nothing in the statute's language suggesting that evidence of the number of a witness's prior convictions would depend on the offense date, rather than the point at which the witness is "be[ing] asked." This makes sense, as questions regarding prior convictions address a witness's credibility at the time of trial. Thus, the court appropriately determined that defense counsel's performance was not deficient for failing to challenge Philipsen's three prior convictions at trial. *See State v. Jacobsen*, 2014 WI App

---

[16] We agree with the State that Philipsen's argument on this point is inconsistent, given that Darcy's conviction for OWI, second offense, also occurred after the offense date.

13, ¶49, 352 Wis. 2d 409, 842 N.W.2d 365 (2013) ("An attorney does not perform deficiently by failing to make a losing argument.").

¶41     Philipsen's final argument that defense counsel was ineffective pertains to "two critical witnesses" who were interviewed by Thao but whose "interviews were never presented to the jury." First, Philipsen claims that during Jennifer Howard's interview with Thao, she "described her 17 years with [Philipsen] indicating he does not have a violent bone in his body and that he would never hurt anyone." We note that Howard did testify at Philipsen's trial. She presented testimony that Philipsen regularly walked his dog and that on the evening in question, Philipsen returned home from his walk and told her about an incident with a woman on the bridge, corroborating Philipsen's version of events. Howard was not, however, specifically asked whether Philipsen was nonviolent.

¶42     We note that although Philipsen references Howard's interview with Thao, he again directs us to Record 230; thus, we are unable to confirm what her alleged statements to Thao may have been. Again, for purposes of our review, we will assume that Record 230 confirms Philipsen's claims regarding Howard's statements. Regardless, Philipsen fails to develop an argument as to how defense counsel's failure to ask Howard about Philipsen's nonviolent nature demonstrates deficient performance or how it prejudiced him. We need not address undeveloped arguments. *See Pettit*, 171 Wis. 2d at 646-47. Accordingly, we reject Philipsen's claim.

¶43     Next, Philipsen argues that defense counsel should have called another witness who would have presented evidence "about Philipsen's erectile dysfunction and sexual preferences, stating that he simply cannot become aroused by vaginal sex." According to Philipsen, this witness would have testified that it

was "impossible" for Philipsen to have committed this crime due to his erectile dysfunction. This witness was never called at trial, she never testified at the postconviction hearing, and Philipsen again cites to Record 230 as support for what her alleged testimony might have been. Further, at the *Machner* hearing, postconviction counsel asked Philipsen, "So you have erectile dysfunction?" To which Philipsen responded, "I don't know if it's been ever diagnosed but perhaps." Defense counsel cannot be said to have performed deficiently by failing to pursue a defense that is not sufficiently supported by evidence in the record.

¶44 Even if we were to find that defense counsel performed deficiently on this point, we cannot conclude that Philipsen established prejudice. We agree with the circuit court's observation that "someone even with a physical issue with regards to sexual functioning still is more than capable of committing a sexual crime." In this case, Darcy's assault involved sexual contact—i.e., Darcy's assailant touched her breasts. It was not a penetration offense and did not involve an allegation that Philipsen used his penis in the assault. We also fail to see how Philipsen's alleged erectile dysfunction would have prohibited him from *trying* to unbutton his pants, as Darcy alleged her assailant attempted to do. Thus, Philipsen has failed to demonstrate that had evidence of his erectile dysfunction been presented to the jury, the result of the proceeding would have been different.

¶45 Finally, Philipsen argues that even if defense counsel did not provide constitutionally ineffective assistance, we should grant him a new trial in the interest of justice because the real controversy in this case was not fully tried. WISCONSIN STAT. § 752.35 grants us the discretionary power to reverse a conviction in the interest of justice where "it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." "Our discretionary reversal power is formidable, and should

be exercised sparingly and with great caution." *State v. Williams*, 2006 WI App 212, ¶36, 296 Wis. 2d 834, 723 N.W.2d 719. Accordingly, we will grant a new trial in the interest of justice "only in exceptional cases." *State v. Cuyler*, 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983).

¶46 Philipsen's argument that the case was not fully tried rests on his assertion that the DNA evidence presented at trial was erroneous for the reasons addressed above and that the defense should have presented its own DNA expert to rebut Hahn's testimony. We do not find Philipsen's arguments on this point persuasive, as he merely rehashes his prior unsuccessful arguments on appeal regarding the DNA evidence and Kessis' testimony.

¶47 In support of his argument and his ineffective assistance claims, Philipsen identifies a juror's affidavit and two jurors' answers to a questionnaire that postconviction counsel sent to the jury. The questionnaire asked that the jurors consider certain facts and answer—with "yes" or "no" responses—three questions as to whether those facts would have affected their decision on Philipsen's guilt or innocence. Philipsen filed two of the juror questionnaires with his postconviction motion, and in both questionnaires, the jurors answered "yes" to the three questions as posed. The juror's affidavit Philipsen filed came from one of same jurors whose questionnaire response Philipsen had filed with his postconviction motion. In the affidavit, the juror stated that he "responded 'yes this would have changed my opinion of [Philipsen's] guilt at trial' to all three questions asked" and that the juror makes "this Affidavit in support of [his] belief that Eric Philipsen should be entitled to a new trial where all the evidence can be fairly presented to the Jury." Based on this information, Philipsen asserts that the jury would have reached a different verdict had the jury been presented with the additional information.

¶48     The State urges us to disregard the postconviction information from the jurors on appeal. First, the State questions "whether the factual assertions in the survey questions are complete or accurately grounded in the evidence presented at the postconviction hearing." We agree that the juror questionnaire distributed by postconviction counsel may have contained inaccurate—or, at the very least, misleading—statements based on the evidence presented at trial and at the ***Machner*** hearing.

¶49     Second, the State argues that although the juror questionnaires and affidavit were submitted to the circuit court with Philipsen's postconviction motion, Philipsen never offered the documents as evidence at the ***Machner*** hearing, and they were not admitted by the court. *See* WIS JI—CRIMINAL 155 (2018). Therefore, according to the State, "the jurors' out-of-court statements in the affidavit and surveys constitute inadmissible hearsay."

¶50     Third, the State argues that "even if the jurors had testified at the postconviction hearing, their testimony would not have constituted competent evidence" under WIS. STAT. § 906.06(2). Section 906.06(2) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may the juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received.

Thus, according to the State, "[a]sking a juror how he or she might have decided a case if the juror it [sic] had heard certain additional evidence undermines [§] 906.06(2)'s express purpose of limiting inquiry into a verdict's validity."

¶51 In reply, Philipsen's only response to the State's arguments regarding the juror questionnaire and affidavit is that the State waived its arguments by failing to object when the documents were submitted to the circuit court. Philipsen notes that the documents were submitted with his brief in support of his postconviction motion for a new trial, and the documents were brought up at the ***Machner*** hearing. Our review of the record, however, demonstrates, as the State argues, that the documents were never marked as exhibits, no foundation was ever laid for the admission of the documents, and the documents were never admitted as evidence by the court. Thus, the State did not and could not waive its objection to an act—admission of the documents—that did not occur. Further, Philipsen does not address the State's argument that WIS. STAT. § 906.06(2) would not allow the juror affidavit and questionnaire to be admitted. *See **Chu***, 253 Wis. 2d 666, ¶41 (argument raised in State's response brief not disputed in defendant's reply may be deemed admitted).

¶52 We conclude that Philipsen has not demonstrated that this case is an "exceptional" one warranting our discretionary reversal in the interest of justice. The fact that Philipsen's case could have been tried differently does not establish that his defense counsel was constitutionally ineffective or that the real controversy was not fully tried. This is not one of the rare, exceptional cases warranting discretionary reversal. *See **State v. Schutte***, 2006 WI App 135, ¶62, 295 Wis. 2d 256, 720 N.W.2d 469. We therefore decline to grant Philipsen a new trial in the interest of justice.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.