# COURT OF APPEALS
## DECISION
## DATED AND FILED

## May 12, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP425-CR**

Cir. Ct. No. **2022CF4307**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

KIMBERLY D. ZAPATA,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Milwaukee County: KORI L. ASHLEY, Judge. *Affirmed*.

Before Donald, C.J., Colón, P.J., and Geenen, J.

¶1 GEENEN, J. In 2022, the Deputy Director of the City of Milwaukee Election Commission, Kimberly D. Zapata, requested three military absentee ballots using fictious names and directed that the ballots be sent to a state legislator. As a result of the requests, Zapata was charged with and convicted by a

jury of three counts of election fraud under WIS. STAT. § 12.13(3)(i) (2023-24)[1] and one count of misconduct in public office under WIS. STAT. § 946.12(2).

¶2 Zapata appeals from her judgment of conviction, arguing that she did not violate WIS. STAT. § 12.13(3)(i) because she did not request fictious ballots "for the purpose of obtaining" the ballots. She additionally argues that she did not violate WIS. STAT. § 946.12(2) because there was no material connection between her conduct and the powers and duties of her public office.

¶3 We conclude that WIS. STAT. § 12.13(3)(i) prohibits making false statements for the purpose of actually or constructively obtaining an absentee ballot, and Zapata constructively obtained the ballots she requested. We further conclude that the evidence adduced at trial established a material connection between Zapata's election fraud and her public office sufficient to support her conviction of misconduct in public office under WIS. STAT. § 946.12(2). Accordingly, we affirm.

## BACKGROUND

¶4 In November 2022, the State charged Zapata with misconduct in public office (acting in excess of lawful authority) and three counts of making a false statement to obtain an absentee ballot. According to the complaint, in the fall of 2022, Zapata was the Deputy Director of the City of Milwaukee Election Commission. After the local news reported that "an unknown" individual fraudulently applied for military absentee ballots and had them sent to a state legislator who was advancing "outrageous conspiracy theories" about election

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

fraud, Zapata told her supervisor that she was the person who falsified the requests for absentee ballots. She explained that by requesting the ballots, she was trying "to show how easy it is to commit fraud" when it comes to military absentee ballots.

¶5    Zapata subsequently met with police about her conduct. She admitted that through the "MyVote website,"[2] she "fabricated three individuals who did not exist, … used those fabricated names to have military voter absentee requests sent to the municipal clerks in Shorewood, South Milwaukee, and Menomonee Falls," and then "had the absentee ballots sent to" the state legislator. Zapata wanted to "make a point that there is fraud in existence" and have the legislator "focus" on "actual true fraud[.]" Zapata acknowledged using her work laptop and accessing a "voter registration database" that is "only available to the municipality employees" in order to obtain the legislator's address.

¶6    After the meeting, the State filed the charges at issue in this case, and the case went to trial. The evidence at trial consisted of testimony from the three municipal clerks who received Zapata's military absentee ballot requests, the deputy administrator for the Wisconsin Elections Commission, the lead investigator in this case, and Zapata's supervisor, the Executive Director of the City of Milwaukee Election Commission. The jury also heard Zapata's police interview. This evidence established the following.

---

[2] Per the trial testimony, the MyVote website is a public-facing voter portal available in Wisconsin, wherein voters can request an absentee ballot, view their voting records and registration information, look up their polling place, and view a sample ballot.

¶7     As deputy director for the Milwaukee Election Commission, Zapata worked to ensure that elections ran smoothly and securely, including overseeing absentee voting. Her obligation was to follow the statutorily prescribed processes.

¶8     Prior to the fall 2022 election, Zapata became concerned about the process for requesting military absentee ballots. Because a person requesting a military absentee ballot on the MyVote website did not need to provide photo identification or be registered to vote to make the request, Zapata felt that the process was susceptible to fraud. Zapata raised this concern with her supervisor and with the Wisconsin Elections Commission, to no avail.

¶9     Frustrated with public criticism of her office and by conspiracy theories about election fraud, Zapata wanted "the truth to come out" about "actual problems" with elections. Using her work laptop in the early morning hours of October 25, 2022, she accessed the MyVote website and requested military absentee ballots in the names of three fake individuals: Holly Jones, Holly Adams, and Holly Brandtjen. Zapata looked up random home addresses in South Milwaukee, Shorewood, and Menomonee Falls, and assigned one to each fake name. She chose residences in South Milwaukee and Shorewood because she felt these areas had "subpar" municipal clerks who would not catch the fraud.

¶10    Zapata requested that each ballot be sent to the home of a state legislator because the legislator was "the most vocal election fraud politician" that she knew. To locate the legislator's address, Zapata logged into "WisVote," which is a statewide voter registration database only accessible to "employees who are responsible for administering elections." Zapata hoped that the municipal clerks would issue the ballots and that when the legislator received them, the

legislator would "redirect … her focus away from … outrageous conspiracy theories to something that's actually real."

¶11    The municipal clerks in South Milwaukee, Shorewood, and Menomonee Falls mailed absentee ballots to the legislator's residence.  After receiving the ballots, the legislator issued a press release opining that "someone was trying to point out how easy it is to get military ballots in Wisconsin."  When Zapata's supervisor shared a news article about the legislator's statement, Zapata responded that the legislator "had a point."  Zapata later told her supervisor that she was the person who falsified the requests for absentee ballots.

¶12    At the close of the State's evidence at trial, Zapata filed two motions to dismiss.  The first motion exclusively addressed the misconduct in public office charge.  Zapata argued that the State "failed to show Ms. Zapata's actions of sending three absentee ballots were done in her capacity as a public employee."  She maintained that she "was acting as a private individual[.]"

¶13    Zapata's second motion to dismiss addressed all four charges.  She maintained that the State "completely failed to show Ms. Zapata made a false statement for the purpose of obtaining an absentee ballot."  She asserted that she did not commit election fraud within the meaning of WIS. STAT. § 12.13(3)(i), because the evidence showed that "her only purpose was that the absentee ballots would be acquired by someone else."  Because the misconduct in public office charge was premised on a violation of § 12.13(3)(i), Zapata contended that the misconduct charge should also be dismissed.

¶14    The circuit court denied Zapata's motions to dismiss.  The court reasoned that, as to the election fraud charges, WIS. STAT. § 12.13(3)(i) does not require that false statements be made for the purpose of "personally obtain[ing]"

an absentee ballot. In considering the misconduct in public office charge, the court observed that there was "a lot of" evidence supporting the conclusion that Zapata had acted in her official capacity.

¶15 The jury found Zapata guilty on all charges. Zapata appeals from her judgment of conviction, challenging the circuit court's denial of her motions to dismiss at the close of the State's case.

## DISCUSSION

**I.  The circuit court correctly denied Zapata's motion to dismiss the election fraud charges under WIS. STAT. § 12.13(3)(i).**

¶16 Zapata argues that the legitimacy of the election fraud charges depends on the meaning of the phrase "for the purpose of obtaining" in WIS. STAT. § 12.13(3)(i). "Statutory interpretation and the application of a statute to a given set of facts are questions of law" that we review independently. ***State v. Shoeder***, 2019 WI App 60, ¶6, 389 Wis. 2d 244, 936 N.W.2d 172.

¶17 The well-established rules of statutory interpretation guide our analysis. Statutory interpretation "'begins with the language of the statute.'" ***State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." ***Id.*** Context and structure are also "important to meaning." ***Id.***, ¶46. "Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." ***Id.***

¶18 A statute's purpose is "perfectly relevant to a plain-meaning interpretation of an unambiguous statute as long as" the purpose is "ascertainable from the text and structure of the statute itself, rather than extrinsic sources, such as legislative history." *Id.*, ¶48. "[A] plain-meaning interpretation cannot contravene a textually or contextually manifest statutory purpose." *Id.*, ¶49; *see also* **State v. Dinkins**, 2012 WI 24, ¶29, 339 Wis. 2d 78, 810 N.W.2d 787 ("An interpretation that contravenes the manifest purpose of the statute is unreasonable.").

¶19 We first consider whether the plain meaning of the statutory language is clear. Under WIS. STAT. § 12.13(3)(i), no person may "[f]alsely make any statement for the purpose of obtaining or voting an absentee ballot[.]" Zapata argues that "obtaining" should be narrowly construed to mean actual, physical possession of the absentee ballot by the person who falsely made the statement requesting the ballot, and Zapata never physically possessed the absentee ballots she requested. The State argues that the term "obtaining" commonly refers to the act of coming into "possession" of something by either personally possessing it, or indirectly by acquiring it for another person, and the law recognizes both actual and constructive possession. The State asserts that Zapata did not need to physically "obtain" the ballots to constructively possess them so long as she "exercised control over" the ballots.

¶20 The term "obtaining" is not defined in the statute. "When a term is not defined, a general principle of statutory construction is that the term should be given its 'common, ordinary, and accepted meaning.'" **Dinkins**, 339 Wis. 2d 78,

¶37 (citation omitted). We often refer to dictionary definitions to ascertain an undefined term's common, ordinary, and accepted meaning.[3]

¶21 The dictionary definitions offered by the parties are largely the same, and we choose to refer to the definition from the Oxford English Dictionary, as cited by both parties: "obtain" means "[t]o come into the possession of; to procure; to get, acquire, or secure."[4] Because we agree with the parties that "obtaining" something is the act of coming into "possession" of that thing, we turn to criminal cases involving possessory offenses to further guide our analysis.

¶22 "In cases interpreting criminal statutes governing possessory offenses, [the supreme court] has consistently concluded that the term 'possession' includes both actual and constructive possession." *State v. Peete*, 185 Wis. 2d 4, 14-15, 517 N.W.2d 149 (1994). Constructive possession is "a description of circumstances that are sufficient to support an inference that the person exercised control over, or intended to possess, the item in question." *State v. Allbaugh*, 148 Wis. 2d 807, 814, 436 N.W.2d 898 (Ct. App. 1989) (citation omitted). "Constructive possession may be established by demonstrating that the defendant knowingly had the power and intention to exercise dominion and control over the

---

[3] *See, e.g.*, ***Miller Compressing Co. v. Busby as Trustee of SFM Marital Trust***, 2025 WI App 29, ¶23, 416 Wis. 2d 354, 21 N.W.3d 778; ***State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶¶53-54, 271 Wis. 2d 633, 681 N.W.2d 110; ***Jamerson v. DCF***, 2012 WI App 32, ¶20, 340 Wis. 2d 215, 813 N.W.2d 221.

[4] *Obtain*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/obtain_v (last visited May 8, 2026); *see also Obtain*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/obtain (last visited May 8, 2026); *Obtain*, DICTIONARY.COM, https://www.dictionary.com/browse/obtain (last visited Apr. 21, 2026); *Obtain*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://ahdictionary.com/word/search.html?q=obtain (last visited May 8, 2026).

object, either directly or through others, thus establishing a nexus between himself and the object." ***United States v. Katz***, 582 F.3d 749, 752 (7th Cir. 2009).

¶23 We agree with the State that "obtaining," as used in WIS. STAT. § 12.13(3)(i), does not necessarily require that the person making the false statement intends to physically possess the ballot.[5] Interpreting "obtain" broadly to include actual and constructive obtainment is consistent with case law interpreting criminal statutes governing possessory offenses, and it is consistent with the manifest purpose of the statute. *See **Dinkins***, 339 Wis. 2d 78, ¶¶58-60. Section 12.13 aims to protect elections from various kinds of falsifications and fraud throughout various stages of the election process. *See* §§ 12.13(1)(b), (2)(b)4., (3)(a), (am), (g), (u), (w). It would defeat the purpose of § 12.13 to allow individuals to do what Zapata did here: inject false ballot requests into the electoral system so long as the requestors did not direct that the ballots be sent to themselves or someone they knew. Conversely, the State's construction of "obtaining" is reasonable and consistent with the manifest purpose of the statute. "If a statute is capable of a reasonable construction that carries out the manifest purpose of the enactment, that construction should be given." ***Milwaukee Police Ass'n v. City of Milwaukee***, 2018 WI 86, ¶29, 383 Wis. 2d 247, 914 N.W.2d 597.

¶24 Having construed the term "obtaining" to include constructive obtainment, we turn to Zapata's argument that she did not constructively obtain the ballots. Zapata asserts that she did not know or control the person to whom

---

[5] Indeed, Zapata appears to acknowledge that a person can violate WIS. STAT. § 12.13(3)(i) even if they do not personally receive the physical ballots. For example, Zapata observes that a person might "obtain" a ballot issued to someone else if the applicant continued to exercise control over the ballot through the recipient as her agent.

she sent the ballots, so she did not constructively possess or obtain the ballots. We reject Zapata's argument. The evidence supports the finding that Zapata "obtained" the absentee ballots she requested, and consistent with the case law discussing constructive possession, the pivotal question, then, is whether Zapata "exercised control" over the ballots. *See* ***Peete***, 185 Wis. 2d at 16; ***Allbaugh***, 148 Wis. 2d at 814; *see also* ***Katz***, 582 F.3d at 752.

¶25 We conclude that she did. The evidence demonstrates that by requesting the ballots, Zapata set off a series of actions she knew the ballots would be subjected to. She knew that by requesting the ballots, the ballots would be generated under the fake names that she provided. She also knew that the ballots, once generated per her request, would be sent to the address that she provided. In other words, Zapata controlled both the names under which the ballots would be generated and the destination to which those ballots would be sent. She "knowingly had the power and intention to exercise dominion and control over" the ballots "through others" (i.e., via the election officials that create and send out absentee ballots), "thus establishing a nexus between" Zapata and the ballots. ***Katz***, 582 F.3d at 752. In our view, directing the creation and destination of the false ballots is "exercising control" over them. Because Zapata "exercised control" over the ballots, her conduct violated WIS. STAT. § 12.13(3)(i). Therefore, the circuit court did not err in denying Zapata's motion to dismiss the election fraud charges under § 12.13(3)(i).

II. **The circuit court correctly denied Zapata's motion to dismiss the misconduct in public office charge under WIS. STAT. § 946.12.**

¶26 Zapata also challenges the sufficiency of the evidence convicting her of misconduct in public office under WIS. STAT. § 946.12. We will not reverse a conviction "unless the evidence, viewed most favorably to the [S]tate and the

10

conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). "A challenge to the sufficiency of the evidence presents two questions. We must first determine what the State was required to prove, and then, applying the standard of review noted above, whether it did so." *State v. Schutte*, 2006 WI App 135, ¶15, 295 Wis. 2d 256, 720 N.W.2d 469.

¶27 We begin with the language of the statute. WISCONSIN STAT. § 946.12(2), the subsection under which Zapata was convicted, states that any public officer or employee that does the following is guilty of a Class I felony:

> In the officer's or employee's capacity as such officer or employee, does an act which the officer or employee knows is in excess of the officer's or employee's lawful authority or which the officer or employee knows the officer or employee is forbidden by law to do in the officer's or employee's official capacity[.]

To convict Zapata of misconduct in public office under this statute, the State needed to prove that: (1) at the time of the offense, Zapata was a public employee; (2) in her capacity as a public employee, Zapata fabricated names in order to obtain absentee ballots; (3) Zapata's actions were in excess of her lawful authority; and (4) Zapata knew that her conduct was in excess of her lawful authority. *See* WIS JI—CRIMINAL 1731.

¶28 Zapata argues that she did not act in her capacity as a public employee when she requested the absentee ballots, but rather, she was acting "as a concerned private citizen." She relies primarily on *State v. Schmit*, 115 Wis. 2d 657, 340 N.W.2d 752 (Ct. App. 1983) to assert that she "did not use her official

11

authority to leverage or effectuate what she did," and as a consequence, no "material connection" was established between her conduct and her public office.

¶29 We considered what constitutes a public employee's official authority in *State v. Schmit*, where the defendant, a prison guard, engaged in consensual sex with an inmate while on duty. *Id.* at 658. The prison guard was charged under WIS. STAT. § 942.12(2) for committing an act (fornication) which she was "'forbidden by law to do in [her] official capacity.'" *Schmit*, 115 Wis. 2d at 659 (citation omitted). The circuit court dismissed the charge after determining "that an act of fornication committed by a public officer while on duty did not, standing alone, constitute misconduct in office[.]" *Id.*

¶30 We affirmed, concluding that WIS. STAT. § 946.12(2) "requires on its face more than a mere violation of the criminal code by a public official." *Schmit*, 115 Wis. 2d at 660. Because the purpose of the statute is "the prevention of the misuse of power entrusted to public officers," we found it problematic that there was "no suggestion in the record that the defendant utilized the power of her office in any manner when she had intercourse with the prisoner, or that she committed those acts in any other than a 'purely private capacity.'" *Id.* at 660-62. We observed that there was no suggestion that the defendant "threatened sanctions or offered benefits within her power as a public officer to bestow or withhold in order to obtain the prisoner's consent to the acts." *Id.* at 662. "The mere fact that she was on duty when the acts were committed does not, in our judgment, transform private acts of fornication into acts done in an official capacity. Indeed, her conduct was far removed from any duties of the job she held." *Id.*

¶31 We observed that acts which are "inherently related to the duties of the office in question" may fall within the official capacity of the officer, but

12

"[a]bsent any material connection between the forbidden act and the public office … [the] statute does not apply." *Id.* at 665. The forbidden act must "inherently implicate the power of her public office[.]" *Id.* at 663.

¶32 The cases cited in *Schmit* confirm that acting in an "official capacity" requires a material connection between the public official's duties and powers and the forbidden act. Although those cases did not involve WIS. STAT. § 946.12, our supreme court determined that the defendants were not acting in their official capacities because their duties and powers were not implicated under the circumstances. *See, e.g.*, *State v. Barrett*, 96 Wis. 2d 174, 176, 180-81, 291 N.W.2d 498 (1980) (concluding that, for purposes of a statute prohibiting battery to peace officers, a Richland County deputy sheriff was not acting in his official capacity while making an arrest in an adjacent county because "the attempt to exercise his powers as a peace officer outside of his county of employment is not within the scope of his employment"); *State v. Hibicke*, 263 Wis. 213, 217-18, 56 N.W.2d 818 (1953) (concluding that, for purposes of a statute prohibiting bribery, a town constable was not acting in his official capacity by soliciting money in exchange for exerting his influence with the town board to obtain a trailer-camp license for a person whose application had been previously denied where the constable did not have the power to grant or vote upon the issuance of such licenses).

¶33 We conclude that, unlike the defendants in *Schmit*, *Barrett*, and *Hibicke*, the evidence adduced at trial established a material connection between Zapata's election fraud and her public office. In *Schmit*, nothing in the record suggested that the defendant "utilized the power of her office in any manner" when she committed the acts. *Schmit*, 115 Wis. 2d at 662. That cannot be said here. Zapata used her work laptop to request the absentee ballots, and she entered

13

her employee credentials to access WisVote—an administrative website only accessible to employees administering elections—for the purpose of obtaining the address of the state legislator to whom she sent the ballots. Additionally, Zapata used her institutional knowledge to pick which municipalities to be the target of her fraud, believing that these clerks were "subpar" and would not catch the fraud. Using City-issued equipment and credentials to access an employee-only database for the purpose of obtaining fraudulent absentee ballots from clerks that she believed to be subpar based on knowledge she accrued only because of her public office amounts to a "material connection" between the misconduct and the public office, a connection that is much stronger than the incidental connections present in *Schmit* or the nonexistent ones in *Barrett* and *Hibicke*. In our view, the State established a material connection between Zapata's election fraud and the powers and duties inherent to her public office, and the circuit court was correct in denying Zapata's motion to dismiss that charge.

¶34 Before concluding, we address Zapata's other arguments. Zapata argues that the rule of lenity precludes punishing her for violating WIS. STAT. §§ 12.13(3)(i) and 946.12(2) because those statutes are ambiguous, and "any ambiguity in respect to a penal statute must be resolved against imposing penalty provisions. Unless the legislature has made it absolutely clear against whom penalties lie, penal provisions should not be applied." *Strong v. C.I.R., Inc.*, 184 Wis. 2d 619, 628-29, 516 N.W.2d 719 (1994). This argument is forfeited because Zapata did not present it to the circuit court in her motions to dismiss. *See State v. Bodoh*, 226 Wis. 2d 718, 737, 595 N.W.2d 330 (1999) ("It is the often-repeated rule in this State that issues not raised or considered in the trial court will not be considered for the first time on appeal." (citation omitted)).

14

¶35 Similarly, Zapata makes vague arguments related to the First Amendment and whether she acted in excess of her authority under WIS. STAT. § 946.12(2). In addition to being forfeited because they were not raised before the circuit court, they are undeveloped, and we do not develop arguments for parties. *State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

## CONCLUSION

¶36 For the foregoing reasons, we conclude that the circuit court correctly denied Zapata's motions to dismiss her charges under WIS. STAT. §§ 12.13(3)(i) and 946.12(2). Zapata "obtained" the absentee ballots as that term is used in § 12.13(3)(i), and the State established a material connection between her election fraud and the duties and powers of her public office under § 946.12(2). We affirm.

*By the Court.*—Judgment affirmed.

Recommended for publication in the official reports.